## SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

## Eldon MILLER, Defendant.

### No. 75 Civ. 3391 (JMC).

United States District Court, S. D. New York.

June 27, 1980.

As Corrected July 14, 1980.

---

**466**

William D. Moran, Regional Administrator, Securities and Exchange Commission,

New York City by Donald N. Malawsky, Douglas P. Jacobs, Andrew E. Goldstein, S. Jane Rose, and Paul Lubetkin, New York City, for plaintiff.

Linde, Thomson, Fairchild, Langworthy & Kohn, Kansas City, Mo. by Albert Thomson, Kansas City, Mo. and Grand & Ostrow, New York City by Frank H. Wright, New York City, for defendant.

## OPINION

CANNELLA, District Judge:

After a bench trial, the Court finds that the plaintiff has failed to prove its entitlement to an injunction against the defendant pursuant to 15 U.S.C. § 77t(b), and, accordingly, judgment is entered for the defendant.

Jurisdiction is based upon the federal securities laws. 15 U.S.C. § 77t(b).

## FACTS

*Background*

This is a Rule 10b–5 case involving allegations of deceptive conduct in connection with a highly specialized type of securities transaction, one which is used exclusively by a relatively small class of sophisticated investors. It is therefore essential to develop an understanding of the nature and purposes of such transactions, the market in which they occur, and the expectations of the persons and institutions that engage in them.[1]

The transaction is commonly known as a "repurchase agreement," or "repo" for

---

1. In developing this background, the Court has taken judicial notice of the following sources: E. McCarthy, Reserve Position—methods of adjustment (Federal Reserve Bank of Boston 1964); P. Meek, Open Market Operations (Federal Reserve Bank of New York 1978); M. Stigum, The Money Market: Myth, Reality, and Practice (Dow Jones-Irwin 1978); Lucas, Jones & Thurston, *Federal Funds and Repurchase Agreements*, N.Y.Fed.Res.Bank Q.Rev., Summer 1977, at 33; Smith, *Repurchase Agreements and Federal Funds*, 1978 Fed.Res.Bull. 353 (May 1978); *Fedpoints* [a series of short pamphlets published by the Public Information

Department of the Federal Reserve Bank of New York].

With respect to the background information for which it has relied on these sources, the Court believes that their accuracy cannot reasonably be questioned. Fed.R.Evid. 201(b)(2). The Court notes, however, that one of the sources refers to some of the matters specifically involved in this case. *See* M. Stigum, *supra*, at 315, 326, 331–32. In deciding this case, the Court has considered none of these references, most of which, in any event, appear to be in the nature of multiple hearsay.

short, although it is sometimes also called a "buy/buy back." It involves two parties, who, for reasons that may become clearer, may be deemed the "borrower" and "lender." Each agreement may also be viewed as comprising two distinguishable transactions, which, although agreed upon simultaneously, are performed at different times: (1) the borrower agrees to sell, and the lender agrees to buy, upon immediate payment and delivery, specified securities at a specified price; and (2) the borrower agrees to buy and the lender agrees to sell, with payment and delivery at a specified future date—or, if the agreement is "open," on demand—the same securities for the same price plus interest on the price. The parties customarily provide that any interest accruing on the securities between the dates of the initial purchase and subsequent "repurchase" remains the borrower's property.

From a purely economic perspective, therefore, a repo is essentially a short-term collateralized loan, and the parties to these transactions tend to perceive them as such.[2] The element of the transaction over which the most bargaining usually occurs is the interest rate.[3] The parties customarily refer to the underlying securities as "collateral,"[4] and the risk of a change in the value of the collateral remains with the borrower, even though the lender "owns" it for the term of the agreement.

Why, then, are these deals structured as sales and repurchases rather than straight loans? The answer appears to be threefold: (1) certain regulations of the Federal Reserve Bank [the "Fed"], which treat repos differently from ordinary loans;[5] (2) a desire to circumvent the U.C.C. requirements and other legal obstacles to using ordinary collateralized loans;[6] and (3) market convention.

In order to understand the repo market, a brief discussion of the "federal funds" market may be helpful, since the development of repos is by and large related to that of

2. "The essence of a repo transaction is *not* that securities are being sold, it is that secured *loans* and *borrowings* are being made. Thus the securities 'sold' should be thought of simply as collateral." M. Stigum, *supra*, at 328 (emphasis in original); *see United States v. Erickson*, 601 F.2d 296, 300 n.4 (7th Cir. 1979), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 406 (1980). This does not mean, however, that a security interest under the U.C.C. is created thereby. *See In re Financial Corp.*, No. 79–544, slip op. (Lexis p. 9 n.7) (W.D.Mo. Nov. 23, 1979).

The question of the nature of repurchase agreements has often arisen as relevant to issues of taxability of the interest received by lenders when the collateral involved consists of tax-free municipal obligations. In general, courts have regarded repurchase agreements similar to those described here as secured loans rather than sales-repurchase agreements for tax purposes. *See, e. g., First American National Bank v. United States*, 467 F.2d 1098 (6th Cir. 1972); *Union Planters National Bank v. United States*, 426 F.2d 115 (6th Cir.), *cert. denied*, 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970); *American National Bank v. United States*, 421 F.2d 442 (5th Cir.), *cert. denied*, 400 U. S. 819, 91 S.Ct. 36, 27 L.Ed.2d 4 (1970). *But cf. Citizens National Bank v. United States*, 551 F.2d 832 (Ct.Cl.1977) (absence of obligation to resell required treatment as sale-repurchase agreement rather than as secured loan).

3. *See* Plaintiff's Exhibit 7, at 43-46 (deposition of William T. Hoss) [hereinafter, plaintiff's exhibits will be referred to as PX __; none of defendant's exhibits were marked for identification, and, accordingly, will be referred to descriptively]; *Fedpoints # 4*, "Repurchase and Matched Sale-Purchase Transactions" (April 1977).

4. *See, e. g.*, PX 3, at 18, 33–35 (deposition of Sol Levin); *Sun First National Bank v. Miller*, 77 F.R.D. 430, 432 (S.D.N.Y.1978); M. Stigum, *supra*, at 328; Smith, *supra*, at 354.

5. *See* 12 C.F.R. §§ 7.1131; 204.1(f)(2) (1980).

6. *See* N.Y.U.C.C. §§ 9–101 *et seq.* (McKinney 1964 & Supp.1979); *In re Financial Corp., supra* (nothing in record indicated that repos intended to effectuate a security interest). One of the witnesses herein testified that the County of Los Angeles took the position that upon default by the borrower, it could liquidate the collateral and retain any surplus beyond the amount of the loan plus interest and liquidation expenses. PX 3, at 50–55 (deposition of Sol Levin).

In the case of certain market participants, namely state and local governments, there may also be a desire to circumvent legal prohibitions against lending money to private individuals and corporations. *See* PX 6, Exhibit 1, at 2 (deposition of Robert M. Odell, Jr.).

federal funds transactions, which they resemble considerably. Since the early days of the Fed, member banks have traded reserve balances[7] as a means of allowing those with reserves below their legal requirements to borrow reserves from those with reserves in excess of their legal requirements. This enables the borrowing bank to meet its reserve requirements without having to sell securities from its portfolio, and at relatively lost cost. Since reserve deficits and surpluses can often be brief,[8] most member banks prefer to borrow or lend reserves for relatively short periods, usually overnight, which is possible since such loans are effected over the federal wire.[9] These transactions also benefit the lending banks, since any reserves in excess of their legal requirements are unnecessarily idle assets. And because of their short duration, they do not significantly impair the lending banks' liquidity. As with repos, such transactions are referred to as sales and purchases rather than loans. A borrowing of reserve balances—which came to be known as "federal funds" or "fed funds" —is usually characterized as a "purchase" with an agreement to resell, and a loan as a "sale" with an agreement to repurchase.[10]

Apparently because of their purpose, the Fed treats fed funds transactions differently from either ordinary loans or deposits. Unlike ordinary loans, "sales" of federal funds are exempt from loan limits,[11] and unlike ordinary deposits, "purchases" of federal funds are exempt from reserve re-

---

**7.** Regulation D of the Federal Reserve Bank, 12 C.F.R. §§ 204.1–204.5 (1980), requires member banks to retain a certain specified percentage of their deposits as "reserves," which means, in essence, as uninvested funds. *See generally* E. McCarthy, *supra*, at 13–21; M. Stigum, *supra*, at 17–18. Reserves may be maintained in two forms, either as deposits by the member bank in its non-interest bearing reserve account at the Fed, or as currency and coin held by the member bank. 12 C.F.R. § 204.2 (1980).

Since failure to maintain adequate reserves to meet requirements will subject a bank to penalties, *id.* § 204.3(b), (d), whereas reserves in excess of requirements constitute unnecessarily idle assets, banks generally aim to meet their requirements as closely as possible. Bank deposits fluctuate, however, and member banks often find themselves with an unanticipated reserve surplus or deficit. In order to make short-term adjustments to their reserve positions, therefore, banks developed the practice of trading reserve balances. To effect such a trade, a bank simply instructs the Fed to transfer funds from its reserve account to that of another member. These transfers, which are usually overnight loans, are commonly known as "fed funds" transactions. *See generally* E. McCarthy, *supra*, at 23–27; M. Stigum, *supra*, at 84–86; Lucas, Jones & Thurston, *supra*, at 34–35; Smith, *supra*, at 358–59; *Fedpoints # 15*, "Purchase and Sale of Federal Funds" (June 1978).

**8.** *See* P. Meek, *supra*, at 3–7; M. Stigum, *supra*, at 303–06.

**9.** Banks that are members of the Fed are linked by telephone wire to the Federal Reserve Bank for their region. In turn, these regional reserve banks are linked to the Fed's central computer in Culpepper, Virginia. Most transfers of funds therefore can be made by wire signal to the appropriate regional reserve bank which will then effect the transfers by bookkeeping entries. Consequently, paper drafts are unnecessary for transfers of funds between member banks. *See* M. Stigum, *supra*, at 281–82; Lucas, Jones & Thurston, *supra*, at 36–37; *Fedpoints # 5*, "Book-Entry Procedure" (rev. Sept. 1979).

**10.** *See, e. g.,* E. McCarthy, *supra*, at 23; *Fedpoints # 15*, "Purchase and Sale of Federal Funds" (June 1978). *But see* 12 C.F.R. § 250.-160 (1980). Note the lack of symmetry with the terminology used in repos. The lender in a repo is often referred to as a "buyer" of securities, whereas the lender in a fed funds transaction is called a "seller" of funds. The terminology is similarly reversed with respect to the borrower.

**11.** When a bank purchases Federal Reserve funds from another bank, the transaction ordinarily takes the form of a transfer from a seller's account in a Federal Reserve Bank to the buyer's account therein, payment to be made by the purchaser, usually with a specified fee. The transaction does not create on the part of the buyer an obligation subject to 12 U.S.C. 84 or a borrowing subject to 12 U.S.C. 82, but is to be considered a purchase and sale of such funds.
12 C.F.R. § 7.1130 (1980). There are some exceptions for transactions between affiliate banks. *See id.* § 7.7365 (1980). According to one source, "[t]he foregoing ruling has been interpreted to mean that in the opinion of the Comptroller of the Currency there is no legal limit to the amount a national bank may buy or sell in the Federal Funds market." E. McCarthy, *supra*, at 26.

quirements.[12] The Fed has also acknowledged that certain borrowings by member banks from other institutions, such as savings banks, are essentially identical, and consequently, it has ruled that these, too, are exempt from reserve requirements.[13] The phrase "federal funds transactions," therefore, now generally encompasses all unsecured "loans made in immediately usable funds, against which a commercial bank borrower isn't required to maintain reserves." [14]

Repos are different from federal funds transactions in essentially only two ways. *First*, fed funds by definition can be traded only by institutions whose unsecured loans to member banks are exempt from reserve requirements,[15] whereas repos can be done by anyone with enough money. *Second*, a fed funds transaction is essentially an unsecured loan, whereas a repo is essentially a secured loan. In all other respects, however, they are identical. Both are for very short duration, usually overnight. Both are settled in immediately available funds. And since one day's interest is a rather small fraction, both are done only for large amounts of money.[16] Nevertheless, because of the speed with which they must be concluded, they are both done on the basis of an oral contract subject to a written confirmation.[17] Moreover, so long as the collateral consists exclusively of government or agency securities,[18] repos are exempt from loan limits [19] and reserve requirements.[20]

Repos also contain provisions for the treatment of collateral, which, of course, need not be included in fed funds agreements. Repos customarily provide for a right of substitution, which means that the lender need not resell the identical securities purchased, but may substitute different securities of the same issue. Thus, the lender is not required to safekeep the collateral, but may sell, pledge, use or dispose of it in any manner for any purpose, so long as he resells acceptable securities on the repurchase date.[21] Repos also customarily give added protection to the lender against fluctuation in the value of the collateral, by providing a "margin," that is, a spread between the value of the collateral and the amount of the loan. In other words, the

---

12. *See* 12 C.F.R. § 204.1(f)(1) (1980).

13. *See id.* n.6.

14. *Fedpoints # 15*, "Purchase and Sale of Federal Funds" (June 1978). As the phrase indicates, "immediately usable funds," or "immediately available funds," are a form of money that can be transferred instantly. Deposit balances at the Fed are instantly transferable, since transfer is effected over the fed wire by means of bookkeeping entries. *See* note 9 *supra*. Ordinary checks are not "immediately available," since they usually take several days to clear. *See generally* Lucas, Jones & Thurston, *supra*, at 36–37.

15. These include member banks, various other nonmember banks, and securities dealers under certain circumstances. 12 C.F.R. § 204.1(f)(1), (4) (1980); *see* E. McCarthy, *supra*, at 24.

16. *See generally* Lucas, Jones & Thurston, *supra*, at 33–35. One of the witnesses in this case testified that the minimum his employer would lend on repo was $100,000. PX 2, at 16 (deposition of John O. Youngs). Another source indicates that "[t]ransactions are usually executed in lots of $1 million or more." Lucas, Jones & Thurston, *supra*, at 35.

17. *See* E. McCarthy, *supra*, at 25; Report of Receiver in Bankruptcy at 9, *In re Financial Corporation*, No. 75B–1623 (W.D.Mo.). [This report was admitted into evidence as part of PX 1. It is undated but its author testified in his deposition that it was filed in October 1975. Hereinafter it will be cited as "Bankruptcy Trustee's Report."] One of the witnesses herein testified that his repos, which were frequently in tens of millions of dollars, were negotiated as "gentlemen's agreements," PX 7, at 44 (deposition of William T. Hoss).

18. In the parlance of the market, "government securities," or "governments," are negotiable securities issued by the United States Treasury, which include Treasury bills, notes and bonds. "Agency securities," or "agencies," are securities issued by various federal credit agencies, such as the Government National Mortgage Association. *See* M. Stigum, *supra*, at 24, 27.

19. 12 C.F.R. §§ 6.2, 7.1131 (1980).

20. 12 C.F.R. § 204.1(f)(2) (1980); *see, e. g.*, Lucas, Jones & Thurston, *supra*, at 35.

21. Bankruptcy Trustee's Report, *supra* note 17, at 14–15; *see* Lucas, Jones & Thurston, *supra*, at 45; Smith, *supra*, at 355.

lender will usually demand as collateral securities that are worth more than the amount of the loan.[22]

For repos that last longer than a day, the lender may receive even further protection. "Term repos," which are those for a definite period longer than a day, and "open" repos, which are indefinite and may be terminated by either party on demand, customarily give the lender a right to demand additional collateral if the value of the original collateral declines significantly. In the event the borrower fails to honor such a demand, the lender may unilaterally terminate the agreement, sell the collateral on the open market, and hold the borrower liable for any difference between the amount of the loan plus interest and the recovery from the sale.[23]

As noted above, the types of collateral most commonly used in repos are government and agency securities. One advantage of this is that the risk that the issuer will dishonor them is presumed to be nonexistent,[24] and hence their value does not fluctuate significantly in periods of steady interest rates. Of course, like any other fixed-rate security, their value does fluctuate generally in relation to interest rates: when interest rates rise, their value declines; when interest rates decline, their value rises.[25]

Another advantage of using government and agency securities is their ease of transfer. Most of them are not held in the form of certificates, but rather as bookkeeping entries at the Fed.[26] Thus, they can be transferred without any physical deliveries. If a member bank wishes to transfer securities it owns to another bank, it simply wires instructions to the Fed, which debits one account and credits another. No certificates are necessary. Since the regional Federal Reserve Banks are all linked by wire, these transfers can be made almost instantaneously between member banks anywhere in the nation.[27] And since immediately available funds may be transferred the same way, repos may be cleared very quickly. Regardless of the parties' locations, therefore, the funds and securities may be exchanged almost simultaneously shortly after they come to an agreement.[28]

It is worth noting the different participants in the repo market. Most banks participate, both to adjust short-term cash and reserve positions, and as a continuing source of either funds or brief, highly liquid investments.[29] Even the Federal Reserve Bank participates—but only for the purpose

---

**22.** *See* PX 2, at 36–39 (deposition of John O. Youngs); PX 3, at 32–35 (deposition of Sol Levin); PX 7, at 46–47 (deposition of William T. Hoss); M. Stigum, *supra*, 314–16. Of course, margin can be arranged to protect the borrower instead of the lender, by setting the amount of the loan above the securities' value. *See id.*

**23.** *See* Bankruptcy Trustee's Report, *supra* note 17, at 14; PX 3, at 34 (deposition of Sol Levin). For open repos, even if such a right is not expressly provided, either party has the right to terminate the agreement on a day's notice, and, there is nothing to prevent the lender from notifying the borrower that it will exercise that option unless the borrower provides additional collateral. *See* PX 3, at 66–69 (deposition of Sol Levin); Deposition of Eldon Miller at 50–51 (May 18, 1978). [The defendant's deposition was begun on May 4, 1978, and concluded on May 18, 1978.]

**24.** *See, e. g.,* M. Stigum, *supra*, at 25. The risk that an issuer will dishonor securities is generally referred to as "credit risk," a term which,

unfortunately, has another meaning, and so has not been used in this sense here. *See* note 42 *infra.*

**25.** *See, e. g.,* M. Stigum, *supra*, at 41–55.

**26.** *See* Bankruptcy Trustee's Report, *supra* note 17, at 20–21; *Fedpoints # 5*, "Book-Entry Procedure" (rev. Sept. 1979).

**27.** *See* note 9 *supra.* Because of the book-entry procedure, government and agency securities, like federal funds, may be transferred over the Fed wire. *See Fedpoints # 5*, "Book-Entry Procedure" (rev. Sept. 1979); M. Stigum, *supra*, at 339–41.

**28.** *See* Bankruptcy Trustee's Report, *supra* note 17, at 15.

**29.** *See generally* E. McCarthy, *supra*, at 29–31; Lucas, Jones & Thurston, *supra*, at 38–43; Smith, *supra*, at 355.

of making short-term adjustments to the nation's money supply.[30]

Among the important lenders in the repo market are large corporations and state and local governments. These institutions regularly find themselves with vast amounts of idle cash for brief, often indefinite periods of time. At one time, they would simply have kept such assets in a checking account as demand deposits, which earn no interest. Within the last ten or fifteen years, however, they have grown much more sophisticated about managing their liquid cash positions, and have increasingly turned to short-term instruments—such as Treasury bills, commercial paper, negotiable certificates of deposit, and repos—as a means of earning profit on them.[31]

Of all of these short-term instruments, repos are by far the most flexible. They can be structured as overnight deals and "rolled over" to whatever extent the money is not needed. Or they can be set up as open agreements. In either case they provide exactly what a money manager needs most: liquidity; security in the form of collateral; and a good return. Consequently, they have come to be viewed by many as "income-generating substitutes for demand deposits at commercial banks."[32]

Among the significant net borrowers in the repo market are government securities dealers, who use repos to finance their holdings. Their activities warrant a somewhat detailed treatment, since the defendant in this case was operating as a dealer in government and agency securities. Most dealers run highly leveraged operations, which means that their investment positions in the securities they hold are significantly larger than their net capital. In other words, the dealers tend to borrow a very high percentage of the money they invest. According to one source, dealers as a whole "borrow 95 cents or more of every dollar used to buy securities, pledging the securities bought as collateral."[33] According to another, "[t]he typical dealer is running a highly levered operation in which securities held in position may total 500 or 600 times capital."[34]

Repos are a very convenient way to leverage capital in order to take large positions in a security. And it is easy to see how a repo can be used to borrow against either a long or short position. Simply stated, "long" means taking the risks of *owning*,[35] while "short" means taking the risks of *owing*.[36] When a dealer wants to leverage long, he can buy a large amount of a security and finance nearly all of its purchase price by immediately "hanging it out" on repo—in other words, by borrowing the money and using the securities as collateral. Using repos to leverage short is slightly more complicated. The dealer sells securities he does not own, then lends the proceeds of the sale in a repo, receiving as collateral the same type of securities he has sold.[37] He then delivers the collateral to

---

30. *See generally* P. Meek, *supra*; M. Stigum, *supra*, at 190–98.

31. *See generally* M. Stigum, *supra*, at 316–18; Lucas, Jones & Thurston, *supra*, at 44–46; Smith, *supra*, at 356–57.

32. Lucas, Jones & Thurston, *supra*, at 42.

33. P. Meek, *supra*, at 6.

34. M. Stigum, *supra*, at 219.

35. The principal negative or "downside" risk of owning securities is that their value will decline. The principal "upside" risk, or potential gain, is that their value will increase.

36. The risks of owing securities are generally the inverse of those of owning. In a short position, one suffers a loss if the securities

increase in value, but a gain if their value declines.

37. Market participants usually distinguish between "repos" and "reverse repos," or "reverses," but they are actually the same transactions viewed from different perspectives. Viewed from the position of the borrower, who first sells then "repurchases," the transaction is commonly called a "repurchase agreement" or "repo." Viewed from the perspective of the lender, who purchases then resells, the transaction is commonly called a "reverse repurchase agreement," or simply a "reverse." "Reversing securities in" means lending money and receiving the securities as collateral. Thus, using repos to leverage short is commonly called "reversing" or "running a reverse book." *See* M. Stigum, *supra*, at 321–30.

the initial purchaser to complete the transaction. Since all the parts of these transactions can be cleared over the federal wire, it is possible to arrange to have everything clear nearly simultaneously, thus enabling the dealer to avoid tying up much of his own money for long.

Leveraging is nothing untoward or unusual, since it is, in effect, the way even banks make money.[38] It is a means of increasing the potential net return on capital. A major source of dealer profits comes from correctly predicting market trends and then taking a highly leveraged position in accordance with that prediction. If the prediction proves accurate, the profits can be huge. If it proves wrong, however, so can the losses.[39]

There are two other significant sources of dealer profit. One is known as "carry," which is the difference between the yield of a security and the interest rate charged on the money borrowed to purchase it.[40] Short-term rates are often below long-term rates; consequently, when a dealer purchases government or agency securities and finances them by hanging them out on repo, he can earn the difference between the securities' yield and the repo rate.

The other source of dealer profit is a trading differential or "mark-up" similar to that of any wholesaler or middleman, which arises from the dealers' ability to buy more cheaply than they sell. The reason dealers can do this is that as they become known, and as they build up the volume of their business, their clients expect them to make a market in repos—that is, to be ready to participate as either borrower or lender. Their position as market-makers enables them to command better rates on both sides of the transaction. Thus, a well-established dealer could make a profit by running a "matched book"—that is, without taking a position long or short—by, in effect, lending at higher rates than he borrows.[41]

Of course, these sources of profit entail risks, an understanding of which is essential to this case. The principal risks to anyone trading in securities are: (1) a "credit risk" that one's trading partner will prove uncreditworthy;[42] (2) a "price risk" that the securities involved will change in value against one's expectations; and (3) a "liquidity risk" that one will need cash at a time when it is difficult or disadvantageous to sell the securities or borrow money. These are not rules of law, but of the market.

As to credit risk, the best way to minimize it is to deal only with persons you know, either through prior experience or good reputation, and by contractual protections such as margin where possible. One protects oneself against liquidity risk by prudently tending one's own garden, and by paying attention to the various indicators of trends in the cost and availability of money.

Price risk is more difficult to minimize, because it depends entirely on prognostication. As noted above, for government and agency securities, the price risk is essentially the risk that interest rates will change. In general, once a fixed-rate debt security has been issued, its market value will vary inversely to changes in interest rates.[43]

---

Although the parties in this case used the term "reverse" as well as "repo," and usually distinguished them correctly, the Court finds "reverse" to be unnecessary, and sometimes confusing. Throughout this opinion, therefore, it has avoided using the terms "reverse repurchase agreement" and "reverse," and simply specified, where necessary, the borrower and lender.

38. M. Stigum, *supra*, at 91–93.

39. *Id.* at 218.

40. *See id.* at 217; Lucas, Jones & Thurston, *supra*, at 43.

41. *See* M. Stigum, *supra*, at 218, 326–27.

42. "Credit risk" has two similar meanings. *First*, it is often used to refer to the creditworthiness of the issuer of securities, that is, the risk that the issuer will dishonor, or be unable to redeem, its securities. *Second*, it may be used to refer to the risk that a person with whom one trades will not perform his agreed obligations. The phrase is used in this Opinion only in the latter sense.

43. *See generally* M. Stigum, *supra*, at 41–55, 220–21, 322–23.

A highly leveraged position is very exposed to price risk. For example, if a dealer is leveraged long at 100 times capital in a particular security, a 1% drop in value will wipe out his equity in that position. To illustrate, if a dealer has used $10,000 of his own money and $990,000 of borrowed money to purchase $1 million of a bond at par 100, he can sustain no more than a one point loss without having to put up additional capital: if the price drops to 99, the bonds will be worth only $990,000, precisely what he has borrowed on them, so that his $10,000 would be gone. For short positions, the computations are similar, except that losses arise when the securities' value increases.

"Carry" is also susceptible to the risk of a change in interest rates, but in a different way. As noted above, short-term rates are often below long-term rates. They are also more volatile, however, and often rise above long-term rates.[44] When this happens, the carry is said to be negative, and anyone who has hung securities out on repo will suffer a daily net loss, since the yield on them will be below the rate of interest he has to pay for the money borrowed to buy them. There are roughly similar, although inverse risks to anyone who has taken a short position using repos.

Both of the effects of interest rate fluctuations just described can quickly drain a dealer's operating liquid assets. This is compounded by the likelihood that when interest rates rise, parties that have lent to the dealer will demand additional collateral on their loans, and when interest rates fall, those who have borrowed from him will demand additional money for their collateral.

Among dealers in government and agency securities are three special categories that are pertinent to this case. Certain dealers are known as "primary dealers," which the Fed describes as "institutions which buy new government securities directly from the Treasury and are ready to buy or sell outstanding U.S. government and agency securities."[45] These, then, are the major marketmakers. Approximately thirty of these primary dealers regularly report their trading activities and positions to the Federal Reserve Bank of New York, and are therefore known as "reporting dealers."[46] Finally, there is a group whom market participants call "recognized dealers," which are those reporting dealers with whom the Fed trades when it wishes to buy and sell government securities and do repos as part of its open market operations.[47]

According to the Fed, any dealer, upon becoming a "significant" market participant, may "contact the New York Fed and begin reporting activity and positions informally."[48] Thereafter, if it is satisfied with the dealer's capitalization, trading volume and management, it will add the dealer to its regular reporting list, and may subsequently establish a trading relationship.[49] Today, as well as in 1975, when the events underlying this action transpired, nearly all of the "recognized dealers" had their principal offices within whispering distance of the New York Fed.[50] The defendant in this action had his there as well, although he was not a primary dealer, and hence neither a reporting nor recognized dealer either.

*Financial Corporation and the Commencement of This Action*

Financial Corporation ["Financial"] is an Iowa corporation whose only shareholders

---

44. *See id.* at 53 (Figure 4–5), 217.

45. *Fedpoints # 2*, "Reporting Dealers Defined" (Feb. 1977).

46. *Id.*

47. *Id.*; *see* M. Stigum, *supra*, at 341–42. The Fed disclaims use of the term "recognized dealers." *Fedpoints # 2*, "Reporting Dealers Defined" (Feb. 1977).

48. *Fedpoints # 2*, "Reporting Dealers Defined" (Feb. 1977).

49. *Id.*

50. *See* "List of the Government Securities Dealers Reporting to the Domestic Reports Division of the Federal Reserve Bank of New York" (February 14, 1980) (available from Federal Reserve Bank of New York Public Information Office).

are the defendant Eldon Miller ["Miller"] and his wife Gladys. Its history dates back to 1944, when it was incorporated as Miller Truck and Sales Service. Its name was changed to Financial in 1971.

In the early 1970's, Financial engaged principally in the business of real estate and equipment rental. It conducted most of its business from rented desk space at 30 Broad Street, New York City, which, not insignificantly, is located in the heart of the money market. Miller's activities, however, appear to have centered in Kansas City, Missouri. By the end of 1973, Financial had a stockholders' equity of approximately $0.4 million.[51]

Given its milieu, it is not surprising that Financial began to dabble in the money market. In January 1974, it leased a two-room office with desks and office equipment at 63 Wall Street, and started to purchase government and agency securities, and enter into repos. Both parties agree, however, that significant trading did not occur until November 1974, at which time Financial's repo activity began an astronomic rise.

As later described by the Bankruptcy Trustee, Financial's business in repos "was basically a one-man show." Miller made all the investment decisions, and operated almost exclusively from his Kansas City office. He would transmit trading orders to the New York office, where two subordinates, who were paid as independent "consultants" rather than employees, would execute them as rapidly as possible. Financial employed only one other person, a secretary in the New York office, who was likewise deemed a "consultant" rather than an employee. The New York office maintained two regular outside telephone lines, direct lines to two short-term money market brokers, Short Term International, Ltd. ["Short Term"] and Palumbo & Company ["Palumbo"], and a subscription to the Cantor-Fitzgerald cathode ray screen, which continually transmits current securities market quotations.[52]

Operating essentially as a dealer in repos involving government and agency securities, Financial built up large positions in a relatively brief time. According to one estimate, by July 1975, Financial held assets and liabilities of approximately $1.9 billion.[53] There is no very strong evidence of whether it ever positioned long or short, or whether it always matched its book. The evidence overwhelmingly implies, however, that its holdings were extremely leveraged, perhaps on as little as the equity capital of $0.4 million that existed at the end of 1973.[54] Throughout this time, most, if not all, of its repos appear to have been negotiated by Short Term or Palumbo.

Success, unfortunately, was ephemeral. As mentioned in the background discussion above, the repo market moves quickly, and if this was only suggested by Financial's rapid ascent, it is brought home by its sudden nosedive. In early July 1975, Financial began to have trouble meeting some of its obligations: it failed to deliver securities and funds when required by outstanding repos,[55] and failed to post additional collateral when demanded by lenders, which resulted in forced sales of its collateral, to its further detriment.[56] Despite Miller's attempts to pull out of the tailspin, word of his problems got out, which in rapid turn compounded his difficulties, and eventually precipitated action by the Securities and Exchange Commission ["SEC" or "Commission"].

---

51. Bankruptcy Trustee's Report, *supra* note 17, at 7.

52. *Id.* at 8–9.

53. *Id.* at 15.

54. Part of Financial's working capital appears to have been generated by loans from Miller and his wife, and by other individuals and companies, many of which were apparently personally guaranteed by Miller. *Id.* at 16.

55. PX 2, at 18–22 (deposition of John O. Youngs); PX 6, at 60–63 (deposition of Robert M. Odell, Jr.).

56. PX 3, at 17–20, 91–92 (deposition of Sol Levin).

On July 7, 1975, an SEC investigator telephoned Miller, advised him of his rights, and informed him that an investigation had begun. Later that day, Miller and his attorneys began three days of meetings with the SEC, which culminated in the filing of the instant complaint for preliminary and permanent injunctive relief against Miller and Financial on July 10, charging them with violations of section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. According to the complaint, the defendants had violated the statute and rule by:

1) continuing to engage in securities transactions on behalf of Financial when Financial was financially unable to honor its commitments; and

2) entering into obligations when defendants knew or should have known that Financial could not meet, or could not reasonably expect to meet, such obligations; and

3) failing to maintain and preserve, on a current basis, and disclose to Financial's creditors and others, such books of account and other records as are and were necessary accurately to reflect Financial's true financial condition and ability to meet its obligations;

and by:

making untrue statements of material facts, and omitting to state material facts necessary in order to make, in light of the circumstances under which they were made, the statements made not misleading, concerning, among other things:

1) the true financial condition of Financial;

2) the ability of Financial to meet its obligations as they come due;

3) the use of the proceeds from securities sold by Financial;

4) the source of funds used by Financial to purchase securities.

Complaint ¶ 9 (filed July 10, 1975).

The SEC further alleged that Financial was, on that day, insolvent, proffering as evidence Financial's failures, on July 7 and 8, to honor its repo obligations. It also claimed to have received information that "prior to the opening of the market on July 9, 1975, Financial had outstanding repurchase agreements in excess of $1 billion and securities with a current market value of approximately $18 million less than the amount of the repurchase agreements." Complaint ¶ 6. Without admitting or denying the allegations of the complaint, Miller and Financial consented to the entry of a preliminary injunction and the appointment of a temporary receiver.

On August 18, 1975, Financial filed a voluntary petition of bankruptcy in the United States District Court for the Western District of Missouri.[57] On August 20, Bankruptcy Judge Jack C. Jones entered an Order (1) appointing D. W. Gilmore, Esq., Bankruptcy Trustee for Financial, and (2) enjoining all actions against the debtor.[58] Thereafter, the temporary receiver turned over the records and control of Financial to the Bankruptcy Trustee. Eventually, the SEC consented to the dismissal of its action against Financial on the ground that it would be dissolved upon the termination of its proceedings in bankruptcy.[59]

As to the action against Miller, both parties virtually ignored it until February 14, 1977, when the SEC moved for judgment against Miller by default. Miller had not to that date answered or otherwise moved against the complaint, although the time to do so had expired on July 30, 1975. On February 18, Miller's attorneys opposed the motion and filed an Answer on his behalf, and then moved for leave to withdraw from the case. Before this latter motion was decided, however, Miller moved to dismiss the complaint against him on the ground

**57.** *In re* Financial Corporation, No. 75B–1623 (W.D.Mo.1975).

**58.** Bankruptcy Trustee's Report, *supra* note 17, at 1.

**59.** *See* Memo Endorsed (filed May 10, 1977).

that he had been out of the repo business since the institution of this action and that, therefore, nothing would be served by the entry of a permanent injunction against him. Alternatively, Miller sought transfer of the action to the Western District of Missouri. The SEC opposed both dismissal and transfer. On May 10, 1977, the Court denied Miller's motions, permitted his attorneys to withdraw, and ruled that it would enter a judgment by default unless Miller appeared pro se or through new counsel by May 27, 1977.[60]

New counsel did appear for Miller, and commenced discovery in preparation for trial. Thereafter, in response to interrogatories served by Miller, the SEC drastically narrowed the theory of its action from what had been included in the complaint, stating that:

> The Commission's sole contention in this action is that at the time Financial entered into each of the aforementioned transactions, neither Financial nor Miller disclosed to the customers in said transactions that Financial did not maintain the records described . . . , said records being necessary, plaintiff claims, to make a determination of whether Financial's liabilities exceeded its assets and whether Financial could meet its obligations as they came due.

Plaintiff's Answers to Interrogatories at 4 (filed Apr. 20, 1978). The SEC further conceded that the following statutes and rules did not apply to Financial or Miller during the period of their activity in the repo market:

(a) The broker-dealer registration requirements under Section 15(b) of the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder.

(b) The net capital requirements for registered brokers and dealers under Section 15(c)(3) of the Securities Exchange Act of 1934 and Rule 15c3–1 promulgated thereunder; and

(c) The books and records requirements for registered brokers and dealers under Section 17(a) of the Securities Exchange Act of 1934 and Rules 17a–3 and 17a–4 promulgated thereunder.

*Id.* at 4–5. Finally, the SEC also conceded that "[n]either Miller nor Financial made any representations or disclosures to the customers with whom they dealt on July 7, 1975 concerning either the financial condition of Financial or the books and records kept or not kept by Financial," and that "[n]one of the customers in the transactions occurring on July 7, 1975 made any inquiries either to Financial or to Miller or to any third parties coincerning [*sic*] the nature of the books and records maintained by Financial." *Id.* at 4.

The action was called to trial on April 17, 1978. Neither party produced live witnesses. The Commission introduced six depositions and reserved the right to add the deposition of the Bankruptcy Trustee, which it later did. Thereafter, the defendant introduced his own deposition, as well as the depositions of various individuals who had lent money to Financial in exchange for notes personally guaranteed by Miller.[61]

*Financial's Books and Records*

There is really no dispute that Miller and Financial failed to maintain the journals and ledgers they would have maintained had they followed customary accounting procedures.[62] On the other hand, Miller did

---

**60.** *See* Memorandum Decision and Order (filed May 10, 1977).

**61.** Although these depositions were not introduced into evidence during the trial, both parties consented to their subsequent inclusion in the record. Defendant Miller's Memorandum In Support of His Proposed Findings of Fact and Conclusions of Law at 3 n.* (filed Sept. 6, 1978).

**62.** The specific records the Commission claims Financial lacked are: cash receipt journals; cash disbursement journals; purchase journals; sales journals; inventory journals; inventory control ledgers; general ledgers; and subsidiary customer ledgers. *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law ¶ 14 (submitted July 19, 1978).

maintain records,[63] and therefore, the initial factual question in this case is whether these records were "adequate" for the purpose of ascertaining Financial's financial position.

In support of its contention that Financial's records were inadequate, the Commission makes two points. *First*, the Bankruptcy Trustee was unable to determine all of Financial's assets and liabilities from the records he found, and consequently had to appoint an accounting firm to reconstruct appropriate journals and ledgers.[64] *Second*, the Commission argues that the difficulties experienced by Financial in finding a market, and, thereafter, in meeting its obligations, imply the inadequacy of its books and records.

In opposition, Miller has produced a number of records he claims to have kept in the ordinary course of his business, but which he had initially refused to surrender to the temporary receiver or the Bankruptcy Trustee because he believed that they were his workpapers. He stated that he finally relented in the summer of 1976, when the Trustee promised to make him a good set of copies.[65] Although the Commission rightly criticizes Miller's unjustifiable refusal to produce these documents pursuant to the orders of the temporary receiver and Bankruptcy Trustee, the Court declines to preclude their admission. Miller maintains that he turned over to the Trustee a package of such documents 2½ to 3 inches thick,[66] and, although the plaintiff had sufficient opportunity to do so, it has neither subpoenaed these documents nor controverted their existence.

Among the defendant's exhibits was a sample of a "daily position sheet," an eleven-by-eighteen-inch page containing twenty-two columns, which purportedly lists all of Financial's outstanding securities transactions, most of which appear to be repos, arranged by the maturity date of the underlying security. A similar eleven-by-eighteen-inch sheet listed these transactions by order of the termination date of the repurchase agreements, with the open repos listed at the top. According to Miller, he and his staff produced or updated such sheets, and reduced them to eight-by-eleven-inch paper, on a daily basis. The defendant's exhibits also included samples of daily market quotation sheets for government and agency securities, and daily bank statements.[67]

Miller testified in his deposition that from these daily records, he could determine at any time whether Financial's assets exceeded its liabilities, and whether it could meet its obligations as they came due.[68] The Bankruptcy Trustee essentially corroborated this testimony.[69] Miller also testified that Financial's other employees could decipher the records to determine which repos were due to terminate on any given day, although they may not have been in a position to determine whether Financial had the "financial wherewithal" to enter into any new repos.[70] Neither party called any of these former employees to support or dispute this assertion.

Miller also disputes the inference that his difficulties in meeting his obligations arose from inadequate books and records, contending instead that the real reason for them was a conspiracy among primary dealers in government and agency securities to drive him from the market. He has testi-

---

**63.** Even the plaintiff concedes this. *See id.* ¶¶ 10–13.

**64.** *See* Bankruptcy Trustee's Report, *supra* note 17, at 4–5, 7, 9–11, 16–19.

**65.** Deposition of Eldon Miller at 10–11.

**66.** *Id.* at 17. The Bankruptcy Trustee essentially corroborated this, stating that in the summer of 1976, he received from Miller "a whole pack of these things." PX 1, at 23 (deposition of Bankruptcy Trustee).

**67.** All of these documents were introduced as exhibits to Miller's deposition.

**68.** Deposition of Eldon Miller at 15.

**69.** PX 1, at 17–22 (deposition of Bankruptcy Trustee).

**70.** Deposition of Eldon Miller at 38–40.

fied that starting about June 20, the primary dealers refused to trade with Financial, which made it very difficult for it to find a market for its securities. Thereafter, Financial turned to secondary dealers, but these, too, soon "closed their doors." According to Miller, this inability to find a market made it nearly impossible to clear transactions or post additional collateral when demanded.[71] As additional support for this explanation, Miller has offered a copy of an antitrust complaint filed against a number of alleged primary dealers by the Bankruptcy Trustee in the Western District of Missouri.[72]

Apart from the question of adequacy of Financial's accounting records, there is really only one other factual dispute in this case, namely, whether Miller's failure to disclose the true nature of these records was materially deceptive. On this point, the Commission has introduced the deposition testimony of key employees of three of Financial's repo customers. In general, these individuals stated that information indicating Financial's failure to maintain adequate accounting records would have weighed in their decisions to do business with it.

John O. Youngs, who was at relevant times in charge of the "money desk" at Crocker National Bank ["Crocker"], testified that Crocker lent money to Financial on approximately eight occasions pursuant to repos, and did not know whether Crocker ever borrowed from Financial.[73] In all of the repos, the value of the collateral exceeded the amount of the loan.[74] The first occurred on approximately June 1, 1975, at the initiative of Short Term, with which Crocker had previously dealt.[75] Moreover, the only information that ever passed between Youngs and Financial or Miller, other than that pertaining to the specifics of the transactions themselves, was in the nature of "pleasantries."[76] Youngs never requested any accounting or other information. Nevertheless, he testified that information "that Financial did not keep books and records, such books and records so that they could ascertain its financial condition" would have influenced Crocker not to enter into repos with it.[77]

Sol Levin, the cash management officer for the County of Los Angeles, ["County"] testified that he had engaged in a number of transactions with Financial on the County's behalf, about 90 percent of which were repos, and the first of which occurred in late 1974 or early 1975.[78] All of the repos were initiated by either Short Term or Palumbo,[79] and apparently the County was always the lender.[80] Unlike Youngs, Levin on at least one occasion, in June 1975, did discuss business directly with Miller and asked him for a financial statement of Financial.[81] Levin testified, albeit with some uncertainty, that Miller "mentioned that he expected one at the end of June."[82] Levin

---

71. *Id.* at 32–33, 44–47, 50, 52–53.

72. *Gilmore v. First Boston Corporation*, No. 78–0294 (W.D.Mo. filed Apr. 28, 1978).

73. PX 2, at 5, 15 (deposition of John O. Youngs).

74. *Id.* at 37–38. In fact, Youngs testified that Crocker suffered no loss as a result of Financial's failure to repurchase, since the value of the collateral was above the amount of the loan at the time Crocker sold it on the open market. *Id.* at 27.

75. *Id.* at 6–9, 50.

76. *Id.* at 17.

77. *Id.* at 30–31.

78. PX 3, at 6 (deposition of Sol Levin).

79. *Id.* at 9.

80. This would appear to be the import of a chart entitled "Open Repurchase Agreements," which has been appended as Plaintiff's Exhibit 3 to Levin's deposition.

81. PX 3, at 14, 46.

82. Levin's full statement was:

Other than idle talk, I believe I did ask for when his latest financial statement would be forthcoming, and other than that, I don't remember specifically any of the details. Just be guessing as to what we discussed. And I think at that point Mr. Miller mentioned that he expected one at the end of June, I think. *Id.* at 15.

stated that he also inquired about the source of Financial's working capital, and that Miller told him that "he was investing funds for several insurance companies." [83]

Levin further testified that the primary source of protection for the County in a repo was the margin,[84] and that the only reason he customarily asked for financial statements from his repo trading partners was to avoid getting the County involved with one that might cause it some "embarrassment." [85] In fact, Levin testified that he was so impressed with the "professional manner" in which Financial handled its transactions, that even if Miller had stated that he did not maintain customary accounting records, and could not prepare a balance sheet or financial statement, he would, on behalf of the County, have continued to do business with him.[86] After further questioning, however, Levin did indicate—here again, with uncertainty—that he would have "scaled down the transactions, perhaps," and that it "would have beared on" his decision to do additional business with Financial.[87]

Robert M. Odell, Jr., the Treasurer of the City of Los Angeles [the "City"], and William T. Hoss, an investment specialist for the City, both testified about the City's repos with Financial. Like Crocker and the County, the City appears to have always been the lender.[88] All of the City's repos with Financial were arranged through Short Term, and both Hoss and Odell testified repeatedly that so long as Short Term negotiated the deal, and so long as they were covered by sufficient margin, they "couldn't care less" who was on the other side of the transaction, nor did they ask; as far as they were concerned, the transactions were with Short Term, no one else.[89] In

---

83. *Id.* at 15–16. Given Levin's admittedly poor recall, Miller may have stated only the truth, because at least one of Financial's noteholders was an insurance company. *See* Deposition of Robert Adams at 3–9, 14, Exhibit 4.

84. *Id.* at 57–58, 88.

85. *Id.* at 32, 36, 60–61. Levin also testified that the County suffered no net loss as a result of Financial's failures. *Id.* at 28, 49–50.

86. *Id.* at 38–39; *see id.* at 48.

87. *Id.* at 39–40.

88. PX 6, at 64 (deposition of Robert M. Odell, Jr.). Odell apparently uses the term "reverse" differently from most market participants.

89. *Id.* at 20, 24, 27, 49, 53, 56, 62; PX 7, at 6–7, 22, 33–35, 46–47, 53–55 (deposition of William T. Hoss). "Financial Corporation to me didn't mean any more than from Morgan Guaranty or from a customer account at City Bank. It didn't mean anything to me." *Id.* at 55.

Moreover, in a letter dated July 21, 1975, to the attorneys for the Bankruptcy Trustee, Odell wrote the following:

The Los Angeles City Treasury has never purchased U.S. Treasury Bills or Notes directly from Financial Corporation . . . . We did conduct a number of transactions through a dealer, Short Term International, in which we agreed to purchase U.S. Bills or Notes on fixed dates and also agreed to sell the same or similar investment instruments from our portfolio at future dates and fixed prices, where the seller and the future buyer turned out to be a bank acting on behalf of Financial Corporation. When we made such "buy-buy back" agreements through Short Term International we were not too concerned with whom their clients might be, because of the nature of our investment operations.

The Los Angeles City Treasury is extremely conservative in entering buy-buy back agreements. When instruments being sold to this Office mature within six months, we normally will pay the current market-value cash price for those instruments and the seller's commitment that he will buy the same or similar instruments from us at a fixed cash price following the period during which he has a need for cash. Where the maturities of the securities to be purchased by the City and committed to be resold after short time intervals exceed six months, we insist that the current market value of the instruments exceed the cash which we will pay for the instruments. This practice protects the City against changes in market values should the seller fail to honor his purchase commitment following the few days, weeks, or, on rare occasions, months during which he needs the cash. We have had occasions when we have paid as little as eighty percent of current market value for instruments maturing in two years, where the City Treasury committed to resell such instruments to the original seller at the end of two weeks. When making buy-buy back (simultaneous purchase and sale) commitments, we always assume that the seller might not honor his purchase commitment; consequently, we insist on

fact, the City was probably doing repos with Financial through Short Term since as early as November 1974,[90] but Hoss did not know that Financial was on the other end of some of the deals until some time in June 1975,[91] and Odell found out only after a receiver was appointed in this action.[92] Moreover, Odell never spoke to Miller or anyone else from Financial,[93] and Hoss met Miller only once, at a luncheon, and could not remember what they discussed.[94] Neither ever spoke to anyone at Financial for the purpose of arranging or negotiating any repos. Odell did testify, however, that if he "knew that the other party to a repurchase agreement was not keeping books and records from which it could accurately ascertain its financial condition," it would weigh in his decision to do business with it.[95]

## DISCUSSION

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

.     .     .     .     .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may

prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5, 17 C.F.R. § 240.10b–5 (1980), which the Securities and Exchange Commission has promulgated pursuant to that section, provides:

It shall be unlawful for any person, directly, or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of a national securities exchange,

(a) to employ any device, scheme or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The Commission's theory of the instant case is that Miller and Financial failed to keep accounting records that would have enabled them to ascertain Financial's net assets and liabilities,[96] and that such failure, and their failure to disclose that fact to their repo customers, constitute violations of section 10(b) and Rule 10b–5. The Court finds, however, that Miller's records were sufficient to enable him to monitor all of Financial's assets and liabilities, and deter-

---

terms which will protect both the City's investment principal and interest expectations should it be necessary to (1) hold the purchased instruments to maturity, or (2) sell them on the open-market following the other party's failure to purchase on the committed date.
PX 6, Exhibit 1, at 1–2. The letter further indicated that while the City did not "lose" money because of Financial's failure to honor its commitments, it could have increased its yield had the commitments been honored. *Id.* at 4.

**90.** PX 7, at 9 (deposition of William T. Hoss).

**91.** *Id.* at 21, 22, 31.

**92.** PX 6, at 8–9 (deposition of Robert M. Odell, Jr.).

**93.** *Id.*

**94.** PX 7, at 31–36 (deposition of William T. Hoss).

**95.** PX 6, at 16–17 (deposition of Robert M. Odell, Jr.).

**96.** *See, e. g.,* Transcript of Proceedings at 4 (April 17, 1978).

mine its financial position, on any given day.

Neither the Bankruptcy Trustee nor the accountant who testified by deposition had seen Miller's records at the time they suggested that Financial's records were inadequate. And, although they believed Financial needed a set of customary accounting records, this appears to have been more for the purpose of permitting *them* to ascertain Financial's net assets and liabilities. It says nothing about *Miller's* ability to ascertain Financial's position from the records he kept.

Further, the plaintiff has argued that Financial's eventual failure implies that its records were inadequate. But what about the opposite implication of its eight months of success? Moreover, Levin testified repeatedly that Financial handled its business very professionally, which would also strongly indicate that Miller was, at least until his failure, sufficiently apprised of all pertinent information.

Rather than inadequate records, the reasons for Financial's failure appear to be its

heavy leveraging, coupled with Miller's ignorance of the extent to which this exposed Financial to price and liquidity risk, and an unanticipated downturn in the market. From the scant evidence in the case on this point, it appears that in late June, Financial was heavily leveraged long in medium- and long-term government and agency securities.[97] If its positions vis-à-vis Crocker and the City and County of Los Angeles are any indication, Financial was on the borrowing side of most if not all of its repos. And three times during Levin's deposition, he stated that at about that time the value of Financial's collateral began a steady decline.[98] As the background discussion above indicates, this would suggest a period of rising interest rates, which could lead to a quick drain on the liquidity of anyone leveraged long, with the possibility of a drop in the value of net assets to below net liabilities.[99] In further support of this explanation, the structure of Financial Corporation, especially its apparent lack of personnel and tools for predicting market trends, suggests that Miller viewed carry as his primary

97. This may be gleaned from Miller's "daily position sheet" as revised on June 22, 1975. *See* PX 1, Defendant's Exhibit 1 (deposition of D. W. Gilmore).

98. Levin testified as follows about a conversation with Miller on June 7, 1975:

I had asked him for an additional $3,000,-000 in collateral in view of the market conditions. They were sliding . . . . In other words, the value of the securities was close to the amount of dollars we had expended. So, for additional—for protection for market fluctuation, we asked for an additional 3,000,-000 in collateral or cash, whatever the case may be, and which time he said that he would get back to me and let me know. PX 3, at 18; *see id.* at 33–34, 55.

99. History corroborates this hypothesis. Bond and note prices did in fact decline rapidly in late June and early July 1975. Just at about the time Miller claims to have begun experiencing difficulty in finding a market, the Fed announced its intention to tighten credit reins in order to slow the growth of the money supply. *See Prime Rate's Downturn Is Seen Imperiled by Fed's Move to Tighten Its Credit Reins,* Wall St. J., June 23, 1975, at 17, col. 2. Consequently, interest rates began a steady rise. The "federal funds rate" (the market interest rate on federal funds transactions), which was 5½%

on the offer side on June 19, had risen to 7% by July 7. Other significant rates rose concomitantly: The yield on three-month Treasury bills rose from 5.23% just before the Fed's announcement, to 6.009% on June 30, and to 6.203% on July 7; for the same dates, the yield on six-month Treasury bills went from 5.59% to 6.26% and then to 6.51%; rates on one-year negotiable certificates of deposit went from 6½% to 7%, and then to 7¼%. Long-term rates also increased. *See generally* Wall St. J., June 20, 1975 through July 9, 1975. On July 8, 1975, the Wall Street Journal reported: "Yields soared to the highest levels in over five months. . . . . The upward drive in money rates reflects the recent move by the Federal Reserve System . . . to tighten its credit reins." *Interest Rates In Money Market Continue Rising,* Wall St. J., July 8, 1975, at 27, col. 2.

As a result, the prices of fixed-rate debt securities declined. *See Bond Markets: Prices Ease as Investors Take a Cautious Stance To Study Fed's Moves,* Wall St. J., July 8, 1975, at 27, col. 3. Additionally, although short-term rates did not rise above long-term rates, they did rise faster. Hence, the spread between them narrowed. *See id.* The effect of this on someone in Miller's position would have been to diminish his carry profits at a time when his underlying long position was dropping in value.

source of income, and was largely ignorant of the risks entailed in his positioning.[100]

As to Miller's suggestion that the primary dealers and later the secondary dealers closed their doors to him, the Court does not doubt that this occurred. But the Court does not ascribe to Miller's theory of illegal collusive action.[101] These dealers are generally in close contact, and bad news travels quickly. Youngs testified that "rumors" of Financial's precarious situation began to circulate at about the time Miller claims to have experienced trouble finding a market. That the dealers became wary of dealing with Financial is therefore no surprise; nor is the uniformity of their action.

The Court's finding that Miller maintained records that he could decipher is not dispositive, however, since his records were hardly useful to anyone else. Thus, notwithstanding the Commission's theory of the case, there remains the question of whether his failure to disclose the nature of these records to his repo customers constitutes a violation of section 10(b) and Rule 10b–5. This depends upon whether the plaintiff has proven that such nondisclosure was materially deceptive or manipulative.

In *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court held that a cause of action under section 10(b) and Rule 10b–5 requires conduct that "can be fairly viewed as 'manipulative or deceptive' within the meaning of the statute."[102] *Id.* at 473–74, 97 S.Ct. at 1301. And recently, the Court held that mere silence cannot be considered a manipulative or deceptive act in the absence of a "duty to disclose." *Chiarella v. United States*, 445 U.S. 222, 225–30, 100 S.Ct. 1108, 1113–15, 63 L.Ed.2d 348 (1980). Such a duty, the Court indicated, could arise from "a relationship of trust and confidence between parties to a transaction." *Id.* at 7. Or, as this Court has stated, "mere silence is deceptive only to persons with particular reasons to draw specific inferences from it." *Klamberg v. Roth*, 473 F.Supp. 544, 550 (S.D.N.Y.1979).

As to Odell, Hoss, and the City of Los Angeles, there is absolutely no evidence from which to infer a duty on Miller's part to disclose anything. They did not even know when they were dealing with Financial, and so could not have been misled by—indeed, could hardly have reasonably inferred anything whatsoever from—Financial's silence about its books and records. Similarly, since they "couldn't care less" who the principal was in the repos arranged by Short Term, the absence of information about Financial's books and records could not have been material to them.

Nor does the evidence suggest any duty to disclose to Youngs or Crocker. Since they had no "relationship of trust and confidence" with Financial or Miller, and since they never requested financial or accounting information, Miller's and Financial's silence was not materially deceptive to them either. Like Chiarella, Miller "was not their agent, he was not a fiduciary, he was not a person in whom [they] had placed their trust and confidence." *See Chiarella, supra*, 100 S.Ct. at 1117.

Levin, however, was different. And so was Miller's conduct toward him, for it was not "mere silence." When Levin requested a financial statement, Miller led him to believe that he could expect one at the end of June. Although the evidence is hardly overwhelming, at least this much appears to have occurred, regardless of the accuracy of Levin's recollection, and regardless of Miller's precise words. In light of the state of

---

**100.** Also, one of Financial's noteholders seemed to recall that carry was the source of Financial's profits. Deposition of William V. Barton, at 10–11.

**101.** The Court is especially skeptical about the antitrust complaint filed by the Bankruptcy Trustee, since the Kansas City attorney who signed that complaint has co-represented Miller in this case since 1977. In fact, the Court questions the propriety of an attorney's acting for both the trustee in a bankruptcy and the sole shareholder of the debtor in a somewhat related action.

**102.** The Court defined manipulative as a "term of art" referring to a variety of practices, none of which are claimed to have been involved here. *See* 430 U.S. at 476, 97 S.Ct. at 1302.

Miller's records, and the absence of any evidence to indicate that preparation of such a statement ever began, the Court concludes that Miller must have intended to throw Levin off the scent. And in light of Levin's inquiry, which indicated his presumption that Financial maintained customary records, Miller's partial response, even if true, was intentionally misleading in that it failed to disclose that Financial did not then, or ever, have what was customarily considered a "financial statement." Only if Miller had said nothing at that point could he have avoided a duty to disclose the full truth. But any statement which induced Levin to continue in his false presumption would have been deceptive, and a clear violation of the Rule's express prohibition against omitting facts "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. 240.10b–5(b).

The next question, then, is whether this misstatement and nondisclosure were material, since materiality is also a requisite of a Rule 10b–5 cause of action. Under the prevailing standard, a fact is material if there is "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable" purchaser or seller in the transaction. *See TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.; see, e. g., Goldberg v. Meridor,* 567 F.2d 209, 218–19 (2d Cir. 1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978).

Notwithstanding Levin's assertion that he would have continued to do business with Financial in any event, the Court finds that Miller's nondisclosure was material. While the truth might not have deterred Levin from further transactions with Fi-

nancial, he or any other reasonable investor in his shoes certainly would have viewed it as significantly altering the total mix of information available. Levin admitted as much.[103] And, especially during periods of market fluctuations, it would probably have made Levin much more careful to get an adequate margin in his repos with Financial, and much less willing to hold off selling Financial's collateral on the open market if it failed to meet any of its obligations.

This leaves the question of whether an injunction should issue against the defendant. On this issue, the Court of Appeals for this circuit has in several recent cases emphasized "the need for the SEC to go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence." *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 100 (2d Cir. 1978); *accord, SEC v. Monarch Fund,* 608 F.2d 938, 943 (2d Cir. 1979); *SEC v. Universal Major Industries, Inc.,* 546 F.2d 1044, 1048 (2d Cir. 1976), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977). In the *Commonwealth Chemical Securities* case, *supra,* the court listed some of the factors which a district court may consider in assessing the likelihood of future violations:

the fact that defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an "isolated occurrence;" whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

574 F.2d at 100 (quoting *SEC v. Universal Major Industries, Inc.,* CCH Fed.Sec.L.Rep. ¶ 95,229, at 98,214 (S.D.N.Y.1975), *aff'd,* 546 F.2d 1044 (2d Cir. 1976), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977)).

In the instant case, the Commission has failed to meet its burden. While Miller has been found liable for intentional illegal con-

---

**103.** *See* PX 3, at 39–40 (deposition of Sol Levin).

duct, and continues to maintain his blamelessness,[104] the Commission has shown only one isolated manipulative or deceptive act. And even that one is factually close and raises difficult legal issues, given the nature of the market in which Miller traded, and the expectations of others in that market. Moreover, this Court's finding of deceptiveness is predicated upon Levin's inquiry into Financial's records, which the Commission in its Answers to Interrogatories, seemed to suggest had not occurred. Finally, the Commission has failed to adduce any evidence whatsoever that Miller ever before or after that incident violated the antifraud or any other provisions of the securities laws. Nor has it shown that Miller is now active or has any intention or capability to resume his activity in the repo or any other securities or money market. Accordingly, the Court finds that there is insufficient likelihood of future violations to justify an injunction here.

This is not to say that Miller's and Financial's activities in the repo market should be forgotten. Far from it. But how egregious was Miller's conduct in an environment of sophisticated investors who traded hundreds of millions of their employers' dollars on the basis of a "gentlemen's agreement" with an entity about which they "couldn't care less"? The root of the problems of Financial and those with whom it dealt appears to be the absence of substantive registration, recordkeeping and capitalization rules in the government and agency securities markets.[105] The Court suspects that the SEC knows this. Whether such rules are needed—or wanted—is another matter. But this action is a curious way to try to establish them.

## CONCLUSION

In accordance with the foregoing, the Court finds that the plaintiff has failed to establish its entitlement to an injunction under 15 U.S.C. § 77t(b). The Clerk of the Court is therefore directed to prepare and enter a Judgment for the defendant, in accordance with this Opinion.

SO ORDERED.

---

**104.** Miller's continued assertions of blamelessness have to do mostly with the Commission's charges that he failed to keep adequate records. In light of this Court's findings, these assertions are perhaps justified.

**105.** Compare the requirements for registered brokers and dealers in non-exempted securities, 15 U.S.C. §§ 78o (b), (c)(3), 78q, and the regulations promulgated thereunder.