**472**

In the Matter of FINANCIAL
CORPORATION, Bankrupt.

A. G. BECKER & COMPANY, INC., Loeb,
Rhoades & Co., First Wisconsin National Bank of Milwaukee, European American Bank & Trust Company, European
American Banking Corporation, Southeast First National Bank of Miami, First
National Bank of Miami, Michigan National Bank, Sun First National Bank of
Orlando, First National Bank of South
Carolina, First National Bank of Minneapolis, Wells Fargo Bank and First National Bank of Louisville, Claimants,

v.

D. W. GILMORE, trustee in
bankruptcy, Respondent.

Bankruptcy No. 75B1623–W–4.

United States Bankruptcy Court,
W. D. Missouri, W. D.

Feb. 24, 1982.

Harry Thomson, Kansas City, Mo., for claimants.

Stephen B. Strayer, Kansas City, Mo., for trustee.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER DENYING TRUSTEE'S OBJECTIONS TO ALLOWANCE OF CLAIMS.

DENNIS J. STEWART, Bankruptcy Judge.

The claims of all the above claimants have been timely filed in these proceedings under the old Bankruptcy Act. The initial objections previously imposed by the respondent trustee and other parties have been disposed of in accordance with considerations of law and justice by this court's prior orders. Initially, the objections which had been made by the trustee were of a general nature and, additionally, appeared satisfactorily to be answered by the facts stated in the claims and the documentation attached to the several claims. The objections initially filed by certain creditors appeared to be wholly conclusionary in character and also filed without standing to object. The court, therefore, issued its order directing the trustee to show cause why his objections should not be denied as without factual or legal merit.[1] The other objecting parties were directed to show cause why their objections should not be denied for being wholly conclusionary and for absence of their standing to object to claims.[2]

No responses to those orders were filed by the respective respondents to those show cause orders. Rather, those objections were abandoned in favor of new sets of objections filed by the creditor Charles Walters, Jr., and by Eldon R. Miller, the chief stockholder and former president of the bankrupt corporation.[3] Later, after review of the objections which were filed by those parties, the court issued its orders to the intervening respondents directing them to show cause why the claims should not be allowed in accordance with their respectively claimed amounts. In the text of those orders, it was observed by the court that, with respect to some of the claims, the respondent Walters had complained that they included interest subsequent to July 10, 1975, which, it was contended, was prohibited by the district court ruling in *Matter of Financial Corp.*, 1 B.R. 522 (D.C.W.D. Mo.1979), affirmed, 634 F.2d 404 (8th Cir. 1980). The court noted, however, that, with respect to the claims of the above and foregoing claimants, the interest which was claimed by some of them was interest to the date of performance and that that date, albeit occurring subsequent to July 10, 1975, was prior to the date of bankruptcy. It

---

1. Thus, in its order of February 24, 1981, directing the trustee and "other objecting parties" (Charles Walters, Jr., Lloyd P. Armstrong, Jerald D. Veatch, Ralph Van Goethem, William V. Barton, Harold E. Cole, and Albert L. Walters) to show cause why the A. G. Becker and Company claim should not be allowed in the sum of $313,327.47, the court observed that: (1) the documentation supporting the claim appeared to be sufficient; (2) that, as to the trustee's claim that the loss should be evaluated as of July 11, 1975, on which date the loss should have been around $112,354.00, "(i)t does not appear from the facts which are currently before the court that the claimant could have sold the treasury bills for any greater price than that which they actually commanded"; (3) that the objections of the "other objecting parties"

were "wholly conclusionary and unsupported by any factual detail" and were deniable additionally "for lack of standing of the objectors"; and (4) that the claimant did not appear to seek any interest on the loss subsequent to July 10, 1975, the date of the appointment of a receiver by the United States District Court for the Southern District of New York in violation of the rule of *Matter of Financial Corp.*, 1 B.R. 522 (D.C.W.D.Mo.1979), affirmed, 634 F.2d 404 (8th Cir. 1980).

2. See note 1, *supra*.

3. This intervention was granted at the behest and instance of the trustee and his former counsel.

was therefore concluded by the court that the interest claimed by some of the claimants in this manner was "part of the loss" and therefore allowable even under the rule of *Matter of Financial Corp., supra,* which is restricted to disallowing interest "on the loss" which accrued after the appointment of the receiver by another court on July 10, 1975. The reasoning utilized by this court to support its tentative conclusion is quoted in the marginal note.[4] Because none of the parties has raised any contention or authority which would impeach that reasoning, it should be and is hereby concluded that, in such claims, the interest which is part of the loss and which accrued prior to the date of bankruptcy of Financial Corporation, August 18, 1975, should be allowed.

In the same orders, the defense which was interposed initially by the respondent Walters, that of impossibility of performance by reason of government interference, was dealt with. That issue is also now finally resolved, after full hearing, by this court's order of December 28, 1981.[5]

In response to this series of orders, filed by the court on February 24, 1981, or thereabouts,[6] the respondent Walters filed supplemental legal arguments primarily addressed to the now-resolved issue of impossibility of performance. The respondent Miller, however, stated several defenses in the most general and conclusionary terms, none of which have any merit to warrant current consideration,[7] and further sought

4. "The interest which is ... claimed is interest which is *part of the loss* sustained by the claimant and which has a character which is distinct from interest *on the loss* which Judge Hunter's opinion dealt with in *Matter of Financial Corp.,* 1 B.R. 522 (D.C.W.D.Mo.1979), affirmed, 634 F.2d 404 (8th Cir. 1980). Interest of the former category appears to be allowable as a claim under the literal wording of section 63(a)(1) of the Bankruptcy Act to the following effect: 'Debts of the bankrupt may be proved and allowed against his estate which are founded upon ... a fixed liability, as evidenced by a judgment or instrument in writing, absolutely owing at the time of the filing of the petition by or against him, whether then payable or not, with any interest thereon which would have been recoverable at that date or with a rebate of interest upon such as were not then payable and did not bear interest." The filing date of this bankruptcy case is August 18, 1975, which is well after July 23, 1975, (the date on which the loss of the claimant was sustained). It is doubtful, given the nature of the interest sought, that the ruling in *Matter of Financial Corp., supra,* can be thought to abrogate the letter of the above statute. In the case relied upon, at least in part, by the objecting creditor Walters, *Securities and Exchange Commission v. Miller,* 495 F.Supp. 465, 467 (S.D.N.Y.1980), it is recognized that the interest on a repurchase agreement is the actual bargained-for element and thus is the loss which is actually sustained upon breach of the repurchase agreement: 'The parties customarily provide that any interest accruing on the securities between the dates of the initial purchase and subsequent "repurchase" remains the borrower's property ... (T)herefore a repo is essentially a short-term collateralized loan, and the parties to these transactions tend to perceive them as such. The element of the transaction over

which the most bargaining usually occurs is the interest rate.' Further, in his opinion in *Matter of Financial Corp., supra,* Judge Hunter makes his ruling explicitly applicable to 'accrued interest' which augments or increases the contract loss and also cites with approval Anno., Interest Pending Bankruptcy, 39 A.L.R. 457, 466, which in part relates to the allowability of interest as damages in insolvency or bankruptcy proceedings. It seems clear that Judge Hunter's ruling applies to 'accrued interest' as opposed to interest awardable as damages."

5. That order should be regarded as incorporated by reference into this one, as fully as if set out herein verbatim, with respect to each of the claims of the claimants listed in the style hereof.

6. The paradigm order was that issued in the matter of the claim of A. G. Becker and Company on February 24, 1981.

7. The intervening respondent Eldon R. Miller, on or about June 1, 1981, filed, with respect to many of the claims in this group, a list of generalized "defenses," among which, in addition to those discussed in the text, were the following: (1) "The Claimant has recovered all or a substantial part of its loss from others, and is, therefore, not the real party in interest entitled to recover under its claim." (No evidence has ever been adduced to support this contention.) (2) "The Claimant is not entitled to recover, because its failure promptly to prosecute its claim and its delay from 1976 to 1981 in asking that the matter be set for hearing and obtaining a prompt hearing on the claim constitutes laches." (No prejudice to the respondents has ever been stated or shown which would result in an inability or diminished abili-

to interpose an antitrust claim currently being prosecuted by the trustee in another court as a counterclaim to the claims.[8] On the basis of these generalized defenses, the respondent Miller demanded a jury trial of all issues. In its order of June 16, 1981, the court pointed out that the general defenses raised were, without further particularization, meritless and that, under the governing law, the respondents were not entitled to a jury trial on such issues.[9] The reasoning of the order of June 16, 1981, as it is set out in the foregoing marginal note, is incorporated in this order by reference as the final ruling on the contentions raised by the respondent Miller in this manner. For, in his response to that order, the respondent Miller failed to particularize his factual contentions, but rather simply demanded a hearing and therefore appealed the court's order of June 16, 1981.[10] This appeal was later voluntarily dismissed by Mr. Miller.[11]

In the meantime, the trustee was reinstated as the proper objecting party respondent and these claims were all the subject of the hearing abovementioned on the lone issue of impossibility of performance. As noted above, that issue has been now resolved by the order of December 28, 1981, denying that defense. Subsequently, the court required the trustee to state in writing the facts which he contended to be available to support the defenses which had previously been raised by the respondents as well as the trustee. The response filed to that order was, in total, a reiteration of

---

ty to defend against the claims.) (3) "The Claimant is not entitled to recover, since it had no contractual dealings with Financial and its dealings were with corporations which were not agents of Financial." (The evidence which has been adduced does not support this contention. The persons who did the "dealing" are established by the evidence to be the agents of Financial Corporation.)

8. In respect to that "defense," this court noted that "the trustee is currently prosecuting this claim in another court. Further, it is the trustee to whom the cause of action belongs, according to the applicable authorities. See 4A Collier on Bankruptcy para. 70.28, p. 413 (1978). And it is he who will exclusively determine the court in which the antitrust action will be brought. '(T)he trustee, as contrasted with the creditors, alone has the power to sue on a claim belonging to the estate,' 2A Collier on Bankruptcy para. 47.05, p. 1745 (1978), unless the creditor receives specific and express leave of court to succeed to the trustee's exclusive right. And, further, even if the creditor could be said to have so succeeded in this case (and he has not), the bankruptcy court still has discretion to remit actions for trial to state courts (and other courts) when it would be expeditious and in the interest of justice to do so. This is so "even where jurisdiction exists in the bankruptcy court." *In re Axton*, 641 F.2d 1262, 1273 (7th Cir. 1981). It would appear that, without more, the discretion should be exercised in this case to permit the antitrust claim to continue to be processed in a . . . court where it has long been lodged. This is particularly so when it does not appear from the papers which have to date been filed in this case that it can be said that the claimant, in filing an ordinary claim, can be said to have consented to summary bankruptcy court jurisdiction of a counterclaim for alleged antitrust violations. Under the most liberal of rules relating to summary jurisdiction by consent, an ordinary claimant usually is conceived to give consent only to summary jurisdiction of a counterclaim arising 'out of the same transaction.' 2 Collier on Bankruptcy para. 23.08, p. 558 (1976). The respondent does not state facts in his various motions and pleadings now before the court from which it can be ascertained that the counterclaim would be a compulsory, as opposed to a permissive, counterclaim. Further, if the counterclaim is already being processed in another court, it would seem, without more, only to promote unnecessary delay to require this court to adjudicate it over the summary jurisdiction objections which are now in existence by virtue of the claimant's motion to dismiss."

9. In that order, the court quoted 3 Collier on Bankruptcy para. 57.15(3.1), pp. 256–257 (1977), to the effect that "jury trials in liquidating claims are more than ever a matter of judicial discretion and administrative experience" and that, accordingly, there is no right to a jury trial; that, further, no facts were stated on the basis of which a trier of fact by jury or otherwise was warranted; and that the demand for the jury trial was not timely filed. Later, on September 16, 1981, after being reinstated as the proper party respondent, the trustee in bankruptcy expressly withdrew any demand for a jury trial on these claims.

10. Several appeals were filed, in respect of the claims listed in the style of this order, from like orders entered in respect of several of them. All the appeals were later voluntarily dismissed by the appellant.

11. See note 10, *supra.*

the conclusionary claims and contentions previously raised by the respondent Miller and satisfactorily resolved in the court's prior order of June 16, 1981, which, as noted above, is to be regarded as incorporated herein by reference.[12]

Primarily because of a claim by the trustee that his counsel had had difficulty in marshaling the facts which might be available but which had not been made available to him,[13] it was necessary, nonetheless, for the court to set hearings on all the claims of the claimants which are above referenced in the style of this order. The initial hearing was conducted, in each case, during the week of October 19, 1981, and adjourned hearings were held with respect to some of the claims on November 16, 1981.

In these hearings, the trustee, through the testimony of Eldon R. Miller, the former president of the bankrupt corporation, presented certain basic contentions and calculations which could easily have been presented in written response to the court's prior orders. In virtually all the claims of the claimants in this particular group of claims, these general contentions were the same, although the calculations pertinent to each of the cases were different. But, for the sake of efficiency, because the claims and contentions are all virtually the same and because this court deems them all to be meritless, they will all be outlined and ruled upon in this one order, rather than in several different orders. The contentions and rulings upon them are contained in the paragraphs which follow:

■ (1) *The purchase and repurchase agreements are not really enforceable contracts,* but rather only exchanges of value by means of which "merchandise"—i.e., the government securities—is exchanged for cash or credits. This contention has been offered by the trustee through the testimonial sponsorship of Mr. Miller. Extensive direct and cross examination has been employed in the respective efforts of the claimants and the trustee to prove that a contract must or could not exist. But the simple facts are that, with respect to the above mentioned claimants, the transactions involved the sale of securities by one party to the other with an agreement by the seller to repurchase the securities on a date certain in the future and of the buyer accordingly to resell the securities on that date.[14] The mutual promises involved and

12. The trustee filed an initial response by counsel on August 12, 1981, in which he primarily requested more time in which to file anything but the most generalized response. Thereafter, on September 16, 1981, the trustee, by counsel, filed a more complete factualization of the defenses which had previously been asserted in a wholly conclusionary manner by the former respondent Eldon R. Miller. See note 7, *supra.* Additionally, it was asserted in that response that "the sales in some instances were in self-dealing transactions with subsidiaries, insiders and affiliates, and, therefore, not arms' length transactions representing true market value, but rather in-house transactions manufacturing paper loss, and not real loss." The evidence which was adduced in the hearings on the claims of the above claimants, however, was insufficient to support this contention. It is also additionally stated in the response of September 16, 1981, that "the funds used by the claimants to purchase collateral from the Bankrupt were provided by unidentified affiliates or insiders, and were not from the treasury of the claimant, and that, further, the claimant's alleged loss was abrogated or mitigated in whole or in part by its said insider or affiliate who is the real party in interest to the claim, if any

claim there be." Again, with respect to the above claimants, there was no evidence in the hearings to support this contention. Another more specifically advanced "defense" was that "the claimants' claims are based upon contracts made with Short-Term International, Inc. and Polumbo, Inc., securities brokers; that Short-Term and Polumbo were securities brokers acting in their own right and behalf and not the agents of the Bankrupt." But, as noted previously, in note 7, *supra,* the hearings disclosed no evidence except that Short-Term International, Inc., was the agent of the bankrupt. In the response of September 16, 1981, the trustee abandons the "defense" of "laches." See note 7, *supra.*

13. In his response of September 16, 1981, see note 12, *supra,* the trustee notes, with respect to all the defenses there raised that his "contentions of fact are not intended to be all inclusive but rather are averred upon information and belief acquired through initial investigation ..."

14. Additionally, it must be noted that the district court has previously determined that contracts such as are here in issue with respect to

the details which are specified in the transaction meet the definition of an enforceable contract.[15] There is no evidence that such agreements are anything but enforceable contracts [16] and cross-examination of Mr. Miller has deftly demonstrated how the brisk business in securities would be greatly undermined if the buyers and purchasers could not rely upon the promises made in such transactions. This court must therefore hold that the contracts upon which the claimants' claims are based are lawful and enforceable contracts and that the testimonial claims to the contrary are purest sophistry.

▪ (2) *The claimants were entitled under the agreements to request additional*

security *if they "felt insecure" at any time.* Mr. Miller, through his testimonial statements, also advanced the contention that, under the provisions of these agreements, according to the custom and usage in the securities market, the initial purchaser of the securities had the right to request additional security at any time prior to the repurchase date. From this undenied and uncontradicted proposition, it is argued that, if there was a contract, this was the only remedy. Again, however, no evidence has or can be adduced to support the necessary proposition that this right to request additional security was intended to wipe out the obligations to repurchase and resell.[17] Further, there can be no mutuality

---

these claimants are in fact enforceable contracts. "While this particular repurchase agreement was an oral arrangement, the bankruptcy judge found tht the intent of the parties was not to create a permanent sale with a buy-back option . . . this Court concludes that the bankruptcy judge's determination that this repurchase agreement created a contractual obligation was not clearly erroneous." *Matter of Financial Corp.*, 1 B.R. 522, 525, 526 (D.C.W. D.Mo.1979), affirmed, 634 F.2d 404 (8th Cir. 1980). Some of the claimants in this proceeding have argued that the holding of the district court in that case is *res judicata* in this one. But the same parties were not involved in that case, nor was that case prosecuted as a class action for or against a class of claimants with identical, like, or similar claims based on repurchase agreements. It was necessary, therefore, under the circumstances of this case that the trustee be accorded the hearings which he requested on this issue. See note 13, *supra*. But the district court decision, based upon the same type of agreement, is of great precedential value. See also *Securities & Exchange Commission v. Miller*, 495 F.Supp. 465, 467 (S.D.N.Y. 1980), noting that "repurchase agreements" may be classified as "secured loans" or as "sales-repurchase agreements," but not questioning that they are in fact agreements which are enforceable.

**15.** Insofar as a contract is "(a)n agreement, upon sufficient consideration, to do or not to do a particular thing," Black's Law Dictionary, p. 394 (West 1968), the agreement to repurchase or resell on a date certain and at a specified price indubitably meets the definition.

**16.** The testimony of Eldon R. Miller to the conclusionary effect that the transactions did not represent contracts is not supported by the facts admitted and stated in his testimony. To support the contention that the transactions were not contracts, the trustee, at the instance

of Mr. Miller, sought to introduce in evidence certain depositions taken in the case of *Securities & Exchange Commission v. Miller*, 495 F.Supp. 465 (S.D.N.Y.1980). For the reasons stated below in the text hereof, the depositions must be regarded as inadmissible in this matter. But, even if these depositions were to be regarded as admissible, they do not support the proposition that the repurchase agreements were not enforceable contracts. Robert M. O'Dell, Jr., in his deposition of November 28, 1977, referred to them as "agreements" (tr. 32 and 64); agreed that "the thrust of the agreement . . . is that (the buyer) will eventually be able to sell those securities back at a price (the buyer) has negotiated" (tr. 53); and defined the provision that requires "selling back" of the "bills" as an "obligation." (Tr. 23). The testimony of Sol Levin, in his deposition, to the effect that the "repurchase" provision "is not really significant other than the embarrassment if something should happen" (tr. 32), is admittedly his "personal feeling" and translation of the transactions. He further took the position that some obligations may be "terminated" under a repurchase agreement. (Tr. 53). In his deposition, William T. Hoss, calls the repurchase agreement a "gentleman's agreement," (tr. 44), but admits that he would not want to deal with an insolvent. (Tr. 54). And John O. Youngs, in his deposition of November 30, 1977, speaks of mutual expectations and admits that he does not know of what remedy applies if those expectations are not satisfied because he has "never seen it happen." (Tr. 11).

**17.** See note 16, *supra*. See also *Matter of Financial Corp.*, 1 B.R. 522, 526 n.8 (D.C.W.D. Mo.1979), affirmed, 634 F.2d 404 (8th Cir. 1980), where this issue has been decided contrary to the contentions of Mr. Miller. "Appellant also argues," it is there noted, "that trade

of remedy, as is required by contract law, if the right to request additional security is the only remedy.[18] And if additional security is unavailable, it would be preposterous to suggest that the buyer's remedies would end there. So again, the contention that any contract limits its remedy to the right to request additional security must be rejected as based on pure sophistry.

Alternatively, the trustee contends that, if the claimants did not request additional collateral as of the date that they should have reasonably felt insecure, then they must forthwith sell whatever security they have and be satisfied with the sale price. The trustee has accordingly presented evidence in respect to many of these claims, through the testimony of Mr. Miller, that there were times at which the market price was such that the claimants could have sold the securities or could have purchased securities so as to obviate their losses. This argument, however, is at least equally as sophistical as the foregoing argument. For, only if the request for additional collateral is to be regarded as the *sole* remedy in the transaction can the right to request additional collateral be made a basis for the reduction of the damage award. Otherwise, the contracts purport expressly to provide for repurchase and resale at expressly specified prices without reference to any meantime request for additional collateral. And, of course, when repurchase and resale is effected at the specified price, the matter of any excess amount of collateral becomes irrelevant. None of the claims at bar requests awards for the entire repurchase price undiminished by the value of the "collateral." [19]

■ (3) *But, the trustee claims, through the testimonial contention of Mr. Miller, that claimants should have sold the "collateral" (i.e., the securities) or (if they were repurchasers under the particular contract) should have covered by the purchase of securities at more optimal prices than they did.* To this end, Mr. Miller has testified at great length from the closing quotations for United States Government securities to show that better prices or better value could have been obtained had each of the claimants resold or covered at different times than they actually did. But Mr. Miller's testimony was also to the effect that a closing quotation is no indication of what the market has been during that day, nor of what the prices will be upon the market's opening on the following day.[20] As this court has noted in its prior orders in this case, the respondent must demonstrate that the claimant could have expected to command a better price if that claimant had

practice dictates that appellee's remedies were to call for more Treasury Bills during the period of the repurchase agreement when the market was falling and to liquidate the Treasury Bills in the event of a failure to repurchase. This Court agrees that the record supports appellant's argument as to the existence of these types of remedies, but the record does not support appellant's conclusion that these two remedies are exclusive."

18. And, otherwise, construed as a contract requiring the resale or repurchase on the specified date, repurchase agreements have full mutuality of obligation and remedy.

19. In all cases before the court, the claimants have either resold the "collateral" or have "covered" for "collateral" contracted to be sold to them.

20. This general principle agrees with that expressed in *Matter of Financial Corp.*, 1 B.R. 522, 527 (D.C.W.D.Mo.1979), affirmed, 634 F.2d 404 (8th Cir. 1980), to the effect that the principle of mitigation of damages does not require "an unreasonable expectation in the realm of business judgment." Therefore, when the evidence adduced in respect of the several claims now at bar shows (1), as noted in the text, that the market trends could not reasonably be discerned over short periods of time and (2) that all the claimants sold the securities or, as the case might be, covered for them within a reasonable time following the default. In respect of some of the claimants, the trustee has raised the contention through the testimony of Mr. Miller, that an inordinate time was taken after the date scheduled for performance in which to sell the securities or cover for them. In each of these cases, however, the evidence has demonstrated that the delay was warranted by the necessity for seeking permission from the temporary receiver appointed by the United States District Court for the Southern District of New York or for other reasons, including uncertainty respecting the status of the contract or the market.

sold or covered sooner than it did.[21] But, according to the proof which has been adduced in this case, the closing market quotations provide too speculative of a measure upon which to base a finding that the claimants could have sold or covered at better prices or values than they did. It is sufficient under these circumstances to find that the claimants above all sold or covered within a reasonable time after the default, which they did.[22]

Other objections raised to the allowance of individual claims within this group of claims are of a minor character and have been satisfactorily resolved.[23] The only matters remaining to be commented on are procedural in character. The court, in its foregoing findings and conclusions rejecting the characterization which Mr. Miller would give to repurchase agreements, has found that there was no evidence which would support his characterization of them as "non-contracts" which were simply contemporaneous exchanges of value. In so doing, it has necessarily been its office to consider the admissibility and probative value of the

depositions offered by the trustee, at the behest of Mr. Miller, of officials of the City and County of Los Angeles, California, which he contends would support this characterization. This consideration has resulted in a conclusion by the court that the depositions are not admissible in evidence. And this is so, even though the court of bankruptcy, in taking note of the special position of a trustee in bankruptcy, may be willing to hold that the "unavailability" requirement of Rule 804(b)(1) of the Federal Rules of Evidence, which governs the admissibility of "former testimony," has been met.[24] It is also true even if the claimants can be regarded as successors in interest to parties who have had an opportunity to cross-examine in the course of the depositions which have been offered in evidence, a proposition which is surrounded by some doubt.[25] For the trustee has never produced the original copies of the depositions, even though the court granted a month's adjournment of some of the hearings in which to allow him an opportunity to do so.[26] And, further, even if admissible in

---

**21.** See note 20, *supra.* See the court's prior order of February 24, 1981, to this general effect.

**22.** See note 20, *supra.*

**23.** See notes 4, 7, 8, and 12, *supra.* See also note 20, *supra.*

**24.** The applicable rule, Rule 804(b)(1) of the Federal Rules of Evidence, provides that "if the declarant is unavailable as a witness" former testimony "given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with the law in the course of the same or another proceeding (is not excluded by the hearsay rule) if the party against whom the testimony is now offered, or, in a civil action or proceeding a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." The claimants have cited the court to the decision in *Carter-Wallace, Inc. v. Otte,* 474 F.2d 529, 536, 537 (2d Cir. 1972), in which it was generally held that an expert witness should not be regarded as "unavailable" within the meaning of this rule, for "even if one particular expert is unavailable, there is no need to use his previous testimony to prevent a loss of evidence, because there will usually be other experts available to give similar testimony orally." Neither that case, however, nor *Kaufman v.*

*Edelstein,* 539 F.2d 811, 819, n.9 (2d Cir. 1976), also relied upon by the claimants, involved a trustee in bankruptcy who attempted, but could not secure the voluntary attendance of the deponents who were otherwise beyond the territorial limits of the court's subpoena power. Whether the special position of a bankruptcy trustee, with his ever-present imperative of economizing, would warrant a special exception to the rule of *Carter-Wallace, supra,* need not be decided in this matter, for the reasons set forth in the text hereof.

**25.** There is some indication in the legislative history of Rule 804(b)(1) of the Federal Rules of Evidence that it is doubtful whether "predecessor in interest" means "strict identity or privity," see Notes of Advisory Committee on Proposed Rules, or whether examination, or the opportunity to examine, by one with "similar motive and interest" is sufficient. See Historical Note under Rule 804 in 28 U.S.C.A. Federal Rules of Evidence, p. 690, 692. For the reasons stated in the text, this issue need not be determined under the circumstances of this matter.

**26.** And further, the depositions themselves do not serve to qualify the deponents as expert witnesses, as is necessary to their admissibility in evidence.

evidence, a reading in full of the depositions does not support the claim that they offer support for characterization of the transactions as "non-contracts." [27]

It is therefore, for the foregoing reasons, concluded that the individual claims in this group should be allowed in accordance with the amounts claimed thereon and the amendments thereto. Accordingly, the amounts in which each claim is to be allowed are set out in the following marginal note.[28] Accordingly, it is hereby

ORDERED that the respective claims of the above claimants be, and they are hereby, allowed in the respective sums set out in marginal note 28.

---

27. See note 16, *supra.*

28. The evidence, interpreted under the governing legal principles and other principles stated in this memorandum, shows that the claims of the respective claimants should be allowed in the respective amounts:

A. G. Becker and Company, Inc. ..... $ 313,327.47
Loeb Rhoades and Company ........ 1,575,693.20
First Wisconsin National Bank of Milwaukee ............... 804,270.42
European American Bank and Trust Company ................ 304,715.70
European American Banking Corporation .............. 690,869.42
Southeast First National Bank of Miami .................. 237,310.69
Michigan National Bank ........... 77,721.89
Sun First National Bank of Orlando .. 2,546,349.94
First National Bank of South Carolina 41,176.62
First National Bank of Minneapolis .. 133,421.71
Wells Fargo Bank ................. 1,996,847.66
First National Bank of Louisville .... 124,548.50