Dear Treasurer Edwards,
¶ 0 The Attorney General has received your letter asking for an official opinion addressing, in effect, the following questions:
1. What types of repurchase agreements may the State Treasurerenter into pursuant to 62 O.S. 89.2(A)(7) (1990)?
 2. Does the statutory authority to enter into repurchaseagreements violate the Constitution of the State of Oklahoma?
 3. Is the State Treasurer authorized, under 62 O.S. 90(1990), to enter into repurchase agreements as part of asecurities lending program?
 4. Is the State Treasurer authorized, under 62 O.S.89.2(A) (1990), to sell as well as buy securities authorizedfor investment thereunder?
 INTRODUCTION
¶ 1 Your questions all concern the authority of the State Treasurer to enter into repurchase agreements. In addition, your letter describes a specific type of repurchase transaction and inquires whether the Treasurer is authorized to enter into such transactions. We will respond to both your stated questions and your more specific query in the discussion that follows. Our response necessitates that we also address reverse repurchase agreements.
 I.
¶ 2 The authority of the Treasurer to invest state funds in particular instruments is governed by 62 O.S. 89.2(A) (1990).62 O.S. 89.2(A) provides, in pertinent part, as follows:
 [T]he State Treasurer may purchase and invest only in:
 1. Obligations of the United States Government, its agencies and instrumentalities;
 2. Collateralized or insured certificates of deposit and other evidences of deposit at banks, savings banks, savings and loan associations and credit unions located in this state;
 3. Negotiable certificates of deposit issued by a nationally or state-chartered bank, a savings bank, a savings and loan association or a state-licensed branch of a foreign bank . . .;
 4. Prime banker's acceptances which are eligible for purchase by the Federal Reserve System and which do not exceed two hundred seventy (270) days' maturity . . .;
 5. Prime commercial paper which shall not have a maturity that exceeds one hundred eighty (180) days nor represent more than ten percent (10%) of the outstanding paper of an issuing corporation . . .;
 6. Investment grade obligations of state and local governments . . .;
 7. Repurchase agreements that have underlying collateral consisting of those items and those restrictions specified in paragraphs 1 through 6 of this subsection.
(Emphasis added).
¶ 3 Plainly, 62 O.S. 89.2(A)(7) authorizes the Treasurer to enter into repurchase agreements. The straightforwardness of this statement is deceptive, however. Standing alone, the declaration that the Treasurer may purchase or invest in "repurchase agreements" is not particularly meaningful. What is required to give import to this statement is an understanding of what is meant by the phrase "repurchase agreements." In this regard, we observe that the Legislature has provided no definition of the phrase. Nor has its meaning been adjudicated in any reported decision by an Oklahoma court. Similarly, we note that the phrase "reverse repurchase agreement" is not defined, or even mentioned, by Oklahoma law. Nevertheless, the nature of your inquiry demands that these phrases be construed.
¶ 4 In this endeavor, our cardinal goal is to ascertain the intent of the Legislature by consideration of the statutory language. Walker v. St. Louis-San Francisco Railway Company,671 P.2d 672 (Okla. 1983). The words used are presumed to have the same meaning as is attributed to them in usual and ordinary parlance. Loffland Brothers Equipment v. White, 689 P.2d 311
(Okla. 1984). This determination of intent is to be made in light of the general purpose and object of the act as a whole. MidwestCity v. Harris, 561 P.2d 1357 (Okla. 1977).
¶ 5 So given the foregoing rules of statutory construction, the fundamental question presented here is formulated as follows: What type of transactions did the Legislature intend to permit when it authorized the Treasurer to enter into "repurchase agreements"?
 II.
¶ 6 To provide a context within which this question may be addressed, it is first necessary to identify what are usually thought to be repurchase and reverse repurchase agreements, see how they are used and examine the economic motivations which lead parties to enter into the transactions. It is also necessary to recognize that many different types of "repurchase agreements" are employed in a great variety of business settings. Many of these transactions are not pertinent to the present discussion, however. Consequently, our review of repurchase agreements will be confined to those used in the money markets.[1]
A. Transactional Elements of Repurchase and Reverse RepurchaseAgreements.
¶ 7 A repurchase agreement is generally regarded by market participants as a transaction in which (1) a holder of securities sells the securities to a buyer for cash, and (2) at the same time, the seller agrees to repurchase the securities, or their equivalents, at an agreed price at a stated time. Typically, the repurchase price exceeds the original sale price. This excess is referred to as "interest" and is calculated with reference to the prevailing market interest rate rather than the yield of the underlying securities. The value of the securities transferred also usually exceeds the amount of cash transferred. This excess is referred to as "margin." The agreements often provide that the securities will be periodically revalued and establish a mechanism for maintaining the agreed margin level. In addition, the underlying securities — usually United States government obligations — are often referred to as "collateral." Notwithstanding the use of some loan terminology, the transaction is structured as a sale and subsequent repurchase of securities.See generally, E. Guttman, Modern Securities Transfers, ¶ 5.03[3][a] (1987); M. Stigum, The Money Market, 44-46, 576-80 (3rd ed. 1989); J. Downes and J. Goodman, Dictionary ofFinancial and Investment Terms, 336-37 (1985).
¶ 8 Courts which have adjudicated controversies involving repurchase transactions between private parties have generally adopted the market definition for what constitutes a repurchase agreement. See e.g., In the Matter of Bevill, Bresler SchulmanAsset Management Corporation v. Spencer Savings and LoanAssociation, 878 F.2d 742, 743 (3rd Cir. 1989). Accord, In reESM Government Securities Inc., 812 F.2d 1374, 1375 (11th Cir. 1987); S.E.C. v. Drysdale Securities Corporation, 785 F.2d 38,40 (2d Cir. 1986), cert. denied sub nom., Essner v. S.E.C.,476 U.S. 1171, 106 S.Ct. 2894, 90 L.Ed.2d 981 (1986); First NationalBank of Las Vegas, New Mexico v. Estate of Russell,657 F.2d 668, 669 (5th Cir. 1981); S.E.C. v. Miller, 495 F.Supp. 465,467 (S.D.N.Y. 1980).
¶ 9 A reverse repurchase agreement is, as its name suggests, the mirror image of a repurchase agreement transaction. It is a repurchase agreement viewed from the perspective of the buyer/reseller of the securities rather than the perspective of the seller/repurchaser of the securities. Thus, when a party sells a security and agrees to buy it back, he is engaged in a repurchase agreement. When the same party buys a security and agrees to sell it back, he is engaged in a reverse repurchase agreement. The overall transaction remains the same. It is simply described differently from the distinct vantage point of each party. See generally, M. Stigum, supra at 46, 576. See also,Bevill, Bresler Schulman Asset Management Corporation, supra
at 743.
¶ 10 When a governmental entity becomes a party to repurchase and reverse repurchase agreements, however, the preceding terminology is altered. It has become accepted practice in the marketplace for these entities to transpose the usual designations when they are parties to the transactions. Thus, what private parties would call a repurchase agreement is referred to by a governmental entity as a reverse repurchase agreement. Conversely, a transaction that would normally be regarded as a reverse repurchase agreement by a non-governmental party is considered a repurchase agreement by a governmental entity. See, G. Miller, Investing Public Funds, 100 (1986) (published by the Government Finance Officers Association; describing governmental units' views of repurchase and reverse repurchase agreement transactions). See also, Governmental Accounting Standards Board ("GASB") Statement No. 3, Depositswith Financial Institutions, Investments (including RepurchaseAgreements), and Reverse Repurchase Agreements, 9 (1986).
B. Bankruptcy Code Definition and Treatment of Repurchase andReverse Repurchase Agreements.
¶ 11 Repurchase and reverse repurchase agreements are also addressed by the Bankruptcy Code ("Code"). The Code provides a consolidated definition of the term "repurchase agreement" which specifically applies to "reverse repurchase agreement[s]."11 U.S.C.A. 101(41).
¶ 12 The Code dispenses with the repurchase and reverse repurchase agreement labels and defines the term with reference to the components of the transaction rather than the identities of the parties. So by eliminating references to the perspectives of the parties, the Code has adopted a neutral definition of the transactions which does not distinguish between repurchase and reverse repurchase agreements. The Code definition is limited, however, to transactions involving (1) United States government securities, (2) certificates of deposit, or (3) eligible bankers' acceptances. 11 U.S.C.A. 101(41).[2]
¶ 13 The Code also generally exempts the liquidation of repurchase agreements (and under the Code definition reverse repurchase agreements) from the automatic stay and avoidance provisions of the Code. See, 11 U.S.C.A. 362(b)(7), 546(f) and559; Bevill, Bresler Schulman, supra 878 F.2d at 753.
¶ 14 Interestingly, the Oklahoma statute under consideration,62 O.S. 89.2(A) (1990), permits the Treasurer to engage in repurchase agreements whose "underlying collateral" consists of "prime commercial paper" and "investment grade obligations of state and local governments." These investments do not, however, fall within the Code definition of "repurchase agreement." Thus,62 O.S. 89.2(A) appears to authorize the Treasurer to enter into transactions which do not receive protection under 362(b)(7), 546(f) and 559 of the Bankruptcy Code. But see, Tewv. Arizona State Retirement System, 873 F.2d 1400 (11th Cir. 1989) (11th Amendment bars turnover action by bankruptcy trustee against state where state sells securities following default by counterparty to repurchase transaction).
C. Economic Motivations for Repurchase and Reverse RepurchaseAgreements.
¶ 15 We now turn to the economic factors which motivate parties to enter into repurchase and reverse repurchase agreements. Disregarding for a moment the legal form of the transactions, we can see that every repurchase transaction involves the transfer of cash from one party to another. Accordingly, those who desire to obtain cash seek to enter into a repurchase agreement (or for a governmental entity, a reverse repurchase agreement). For the use of this cash during the term of the agreement, they are willing to pay a market rate of "interest." On the other hand, those who possess idle cash seek to enter into a reverse repurchase agreement (or for a governmental entity, a repurchase agreement) to earn interest on their money.
¶ 16 What parties do with the cash obtained in repurchase transactions varies depending upon the identity and needs of the particular market participant. For example, primary dealers often enter into repurchase agreements to obtain short term cash to finance the distribution of the vast blocks of governmental securities generated by the federal debt. Some dealers engage in the transactions to speculate on the direction of interest rates. Others use the cash obtained from repurchase agreements to exploit potential arbitrage positions. Still others use the cash to temporarily increase liquidity to cover a shortfall. Seegenerally, M. Stigum, supra at 44-46; G. Miller, supra at 104, 106-7.
¶ 17 On the other side of the transaction, institutional investors find that the ease with which the maturity dates of reverse repurchase agreements (or for governmental entities repurchase agreements) may be tailored makes them particularly well suited to "parking" large amounts of cash for short periods of time — often overnight — at market interest rates. See, M. Stigum, supra at 582.
¶ 18 Also, the Federal Reserve Open Market Committee frequently uses the transactions to regulate the amount of the money in circulation. See, Bevill, Bresler Schulman, supra878 F.2d at 745-46. In sum, there are legitimate economic reasons which motivate parties to enter into repurchase and reverse repurchase agreements., With the rapid expansion of the federal deficit, the repurchase agreement market has grown to become one of the largest sectors of the United States money market. M. Stigum,supra at 575.
 III.
¶ 19 Having gained a general understanding of repurchase and reverse repurchase agreements and their utility within the money market, we now return to the first question posed above: What kind of transactions did the Legislature intend to permit when it authorized the treasurer to enter into "repurchase agreements"?
¶ 20 Keeping in mind the rules of construction set forth inWalker, supra, Loffland Brothers, supra, and Harris, supra,
we have examined the whole of 89.2(A). Upon review, we discern a common thread running through the statute: in every investment transaction authorized under 62 O.S. 89.2(A), the Treasurer takes the idle cash under his control and invests it in some selected instrument to earn a measure of interest. The diversity of investment vehicles authorized under 62 O.S. 89.2(A) allows the Treasurer to choose the individual instruments whose specific yield or maturity features best suit the state's fiscal needs at a given moment. Still, all of the transactions permitted by the statute contemplate an investment of funds held by the Treasurer in exchange for a return on that investment. We find that this observation discloses a valuable insight into the legislative intent underlying 62 O.S. 89.2(A). The purpose behind 62 O.S.89.2(A), as a whole and through its constituent parts, is to allow the Treasurer to receive a return on the investment of state funds which would otherwise lie idle.
¶ 21 We further conclude that the Legislature intended the phrase "repurchase agreements," as used in 62 O.S. 89.2(A)(7), to be read in a manner consistent with this common purpose. Accordingly, we construe 62 O.S. 89.2(A) as authorizing the Treasurer to enter into repurchase agreements which put the state's idle funds to work earning a market rate of interest. The transactions authorized by 62 O.S. 89.2(A)(7) take the form of the Treasurer's purchase of securities, with a simultaneous agreement to resell the securities, or their equivalents, to the original seller at a higher price. Our conclusion is only reinforced by the fact that the described transactions are at present widely used in the money market to "park" large amounts of cash for short periods of time at competitive rates. Moreover, our construction is consistent with the definition of a repurchase agreement applicable to transactions by governmental entities. See, G. Miller, supra at 100; GASB Statement No. 3,supra at 9.
¶ 22 Now we come to the question of whether the specific transaction about which you inquire is an authorized investment under 62 O.S. 89.2(A)(7). As set forth in your letter:
 The type of financial transaction at issue consists of two parts, which may be described as follows: in the first part, the Treasurer transfers obligations of the United States Government ("Treasuries") to a second party in return for cash. The second part consists of the Treasurer's agreement to purchase the same Treasuries for a slightly higher price on a specified date in the future.
¶ 23 Once again, the question is: Did the Legislature intend to permit the above-described transaction when it authorized the Treasurer to enter into "repurchase agreements"?
¶ 24 We conclude that it did not. Clearly, this transaction is very different from the one discussed above. Here, the Treasurer is taking in cash from an outside source rather than investing the surplus funds of the state. In this sense, the transaction is the economic equivalent of a loan to the state — not aninvestment by the state. We consider this "borrowing" of dollars, in at least an economic sense, to be a radical departure from the transaction intended to be authorized through 62 O.S.89.2(A)(7). Further, the transaction described in your letter does not correspond to the definition of repurchase agreement accepted as appropriate for transactions by governmental entities; rather it is a reverse repurchase agreement. See, G. Miller, supra; GASB Statement No. 3, supra. Plainly, there is no support in the language of 62 O.S. 89.2(A) for the proposition that the Treasurer is authorized to enter into "reverse repurchase agreements."
¶ 25 For the reasons stated above, we determine that the Treasurer is not authorized under 62 O.S. 89.2(A) (1990) to enter into transactions in which he sells securities and agrees to repurchase the securities, or their equivalents, at an agreed higher price at a stated time.
 IV.
¶ 26 Your second inquiry regards the constitutionality of the Treasurer's statutory authority to enter into repurchase agreements. Because we find that transactions in which the Treasurer sells securities with the agreement to subsequently repurchase them do not comply with 62 O.S. 89.2(A) (1990), we need not determine the constitutionality of such arrangements at this time. However, insofar as 62 O.S. 89.2(A) authorizes the Treasurer to participate in repurchase agreements in which he purchases securities with the agreement to subsequently resell them, the constitutional validity of the statute is properly called into question.
¶ 27 Although your inquiry does not refer to any specific constitutional provision, we are aware that the constitutionality of repurchase agreements has been addressed in two prior opinions of the Attorney General. Those opinions found that repurchase agreements were "short-term collateralized loans." See, A.G. Opin. Nos. 81-183, 81-189. The opinions found that in the context of the investment authority of county treasurers such transactions violated the prohibition against "lending the credit" of a county contained in Okla. Const. Article X, 17. An analogous provision also prohibits the State government from lending its credit. Okla. Const. Article X, Section 15.
¶ 28 The issue is raised here by the lingering controversy surrounding whether repurchase transactions should be characterized as sales and purchases of securities or as collateralized loans. However, subsequent developments in this area of the law require a revaluation of the prior opinions.
A. Characterization of Repurchase and Reverse RepurchaseAgreements.
¶ 29 Historically, courts have faced the question of how to properly characterize repurchase transactions in three broad areas: taxation, securities fraud and bankruptcy. Unfortunately, the judicial experience with repurchase agreements has not resulted in a clear analytical approach toward the transactions.
¶ 30 In the taxation cases, courts have often treated repurchase transactions as loans rather than as purchases and sales of securities for federal tax purposes. See, FirstAmerican Bank of Nashville v. United States, 467 F.2d 1098 (6th Cir. 1972); Union Planters National Bank of Memphis v. UnitedStates, 426 F.2d 115 (6th Cir. 1970); American National Bank ofAustin v. United States, 421 F.2d 442 (5th Cir. 1970).
¶ 31 In securities fraud cases, on the other hand, the courts have consistently found repurchase transactions to involve the requisite "sale or purchase" of securities so as to fall within the scope of the federal securities acts. See e.g., S.E.C. v.Drysdale Securities Corporation, supra. But see, First NationalBank of Las Vegas, New Mexico v. Estate of Russell, supra657 F.2d at 674-6 (whether repurchase agreement is loan or purchase and sale of securities is a question of fact).
¶ 32 One of the securities fraud cases in particular is relevant to our inquiry here. In S.E.C. v. Miller, supra495 F.2d at 467, the district court remarked that "[f]rom a purely economic perspective . . . a [repurchase agreement] is essentially a short term collateralized loan." One must recognize, however, although the court in Miller did not explicitly do so, that the legal consequences of a transaction are not necessarily governed by its "economic reality." In this connection, it is instructive to contrast the Miller court's dictum statement concerning the economic substance of repurchase transactions with its holding that the federal securities laws applied — a conclusion that indicates the court found the existence of a sale or purchase of securities.
¶ 33 Nevertheless, the district court's characterization of the economic substance of repurchase transactions in Miller has been influential and other courts have adopted this view. Seee.g., In the Matter of Legel, Braswell Government SecuritiesCorporation, 648 F.2d 321, 324 n. 5 (5th Cir. 1981). More importantly for our purposes here, the two previous Oklahoma Attorney General opinions expressed a wholesale acceptance of the view of the Miller court. See, A.G. Opin. Nos. 81-183; 81-189.
¶ 34 But a subsequent decision issued by the Second Circuit has, to some extent, undercut the authority of the Miller
opinion. In S.E.C. v. Drysdale Securities Corporation, supra,
the question before the court was whether repurchase agreements were distinguishable from collateralized loans. The court held that for the purposes of the federal securities acts the transactions were not loans, stressing that in a repurchase transaction, unlike in a loan transaction, the "borrower" is free to deal in the collateral. Id. at 41. Thus, the court specifically rejected the idea that repurchase transactions are properly characterized as collateralized loans, at least where the "lender" in the transaction has the right of substitution.
¶ 35 Bankruptcy cases further typify the inconsistency which has prevailed with regard to the characterization issue. For example, one decision, In the Matter of Bevill, Bresler Schulman Asset Management Corporation, Cohen v. Army MoralDefense Fund, et. al., 67 B.R. 557 (D.N.J. 1986), held that the repurchase transactions before the court were properly characterized as purchases and sales of securities and not loans.But see, Bevill, Bresler Schulman Asset ManagementCorporation, supra 878 F.2d at 745 (appellate review of unrelated certified questions in same case; court explicitly declines to meet question of whether district court's characterization was erroneous). Yet, another decision, In theMatter of Legel, Braswell Government Securities Corporation,supra 648 F.2d at 324 n. 5, described similar transactions in terms of being collateralized loans.
¶ 36 As may be evident, our review of the relevant case law reveals that there is no comprehensive analytical approach which enjoys widespread acceptance and adherence by the courts. So given this lack of cohesion, we believe it is unwise to adopt any specific view at this time. We are certain, however, that exclusive reliance upon Miller as a key for determining the proper characterization of repurchase agreements is no longer adequate. Accordingly, Attorney General Opinions 81-183 and 81-189 cannot be said to contain an accurate statement of the law as it exists today.
¶ 37 Of course, this determination alone does not further the resolution of the constitutional question raised in your query.
B. The "Lending of the Credit" Clause of the OklahomaConstitution.
¶ 38 We have already observed that Article X, Section 15 of the Oklahoma Constitution stands as a potential bar against the statutory authority to enter into the repurchase agreements. We now consider whether 89.2(A) does violate the "lending of the credit" clause of Article X, Section 15. Article X, Section 15 provides that:
 The credit of the State shall not be given, pledged, or loaned to any individual, company, corporation, or association, municipality, or political subdivision of the State.
¶ 39 Although our research reveals no reported Oklahoma decisions which thoroughly analyze the meaning and scope of Article X, Section 15 with respect to the investment authority of the Treasurer, we observe that the constitutions of many other jurisdictions possess nearly identical provisions. Accordingly, we may look to the law of these jurisdictions for guidance in our effort to understand and apply the prohibition of Article X, Section 15 of our Constitution.
¶ 40 One case in particular is striking because it confronts a problem virtually identical to the one presented by your inquiry. In Fairbanks v. Stratton, 152 N.E.2d 569 (Ill. 1958), the court considered section 20 of Article IV of the Illinois Constitution which provided that "the state shall never . . . in any manner give, loan or extend its credit to or in aid of any public or other corporation, association or individual." There, the question was whether this clause prohibited the state treasurer from purchasing revenue bonds issued by the metropolitan fair and exposition authority. In upholding the proposed purchase, the court held that because the state would not be placed in the position of a surety for the bonds, there was no constitutional violation. Id. 152 N.E. 2d at 573. See also, Engelking v.Investment Board, 458 P.2d 213 (Idaho 1969) ("credit" clause did not bar investment of state funds in obligations of the United States, bonds of the state and its political subdivisions, high quality corporate obligations, corporate convertible debt securities or certain mortgages).
¶ 41 We find Fairbanks, supra, and Engelking, supra, to be persuasive since both cases analyzed similar constitutional provisions in cases dealing with the investment authority of the state. Applying the rule of those cases, we conclude that participation in repurchase agreements, like investment in revenue bonds, obligations of the United States and high quality corporate obligations, does not offend the lending of the credit clause of the Oklahoma Constitution. Accordingly, the Treasurer's authority under 62 O.S. 89.2(A) to enter into repurchase agreements does not violate Article X, Section 15 of the Constitution of the State of Oklahoma.
¶ 42 To the extent that A.G.Opinions Nos. 81-183 and 81-189 purport to deal with the proper legal characterization of repurchase agreements or the constitutional limitations of such transactions, they are hereby modified.
 V.
¶ 43 62 O.S. 90 of the Oklahoma Statutes authorizes the Treasurer to engage in a securities lending program. In your third question, you inquire whether the authority to enter into repurchase transactions may be derived from this power to engage in a securities lending program. We conclude that it cannot.
¶ 44 62 O.S. 90 defines a "securities lending program" as:
 any program, arrangement or agreement whereby the state deposits securities with a federally or state-chartered savings and loan association, a trust company, a state or national bank, or a broker-dealer registered with the National Association of Securities Dealers, Inc. and insured by the Securities Investor Protection Corporation, for the purpose of permitting the financial institution or broker-dealer to lend securities to a borrower approved by the State Treasurer in return for a fee or charge paid by the borrower for the use of such securities.
¶ 45 As a preliminary point, we observe that repurchase agreements are not mentioned in 90, but that they are the specific subject of 62 O.S. 89.2(A)(7). Thus, any authority to engage in securities transactions under 62 O.S. 90 would not relate to the authority to enter into repurchase transactions. Rather, the authority to engage in repurchase agreements is governed by 62 O.S. 89.2(A)(7).
¶ 46 But assuming for a moment that 62 O.S. 90 was applicable, and further, assuming that it would be appropriate to characterize a repurchase or reverse repurchase agreement as a "loan" of securities, 62 O.S. 90 would still be inapposite because it envisions a three party transaction. First, the Treasurer deposits securities with a financial institution. The financial institution, acting as the agent of the Treasurer, then lends the securities to a third party borrower. A repurchase transaction on the other hand, is a direct two party transaction between the "lender" and the "borrower" of the securities. The involvement of any intermediary financial institution is limited to acting as a clearinghouse.
¶ 47 Moreover, securities loaned pursuant to 62 O.S. 90 are specifically subject to the collateral requirements set forth in the Security for Public Deposits Act, 62 O.S. 72.1 (1990) et. seq. Neither "standard" repurchase agreements nor the particular repurchase transactions described in your letter meet these collateral requirements.
¶ 48 In sum, the authorization to enter into a securities lending program pursuant to 62 O.S. 90 (1990) does not empower the Treasurer to engage in repurchase or reverse repurchase agreement transactions.
 VI.
¶ 49 Your final question is whether the Treasurer may both buy and sell the securities listed in 62 O.S. 89.2(A) (1990). Applying the familiar rules of statutory construction, we deem the phrase "purchase and invest" as used in 62 O.S. 89.2(A) to denote both the purchase and ultimate sale of investment instruments. Cf., Popp v. Munger 268 P. 1100, 1103 (Okla. 1928). Nothing in Oklahoma law suggests otherwise; nor is it evident that the Legislature intended to effect any other result. Indeed, the purchase and sale of securities are transactions which are essential to the orderly management of the fiscal affairs of the state. In addition, the State Treasurer certainly has the authority to sell securities he has purchased rather than holding them until they mature. Accordingly the Treasurer is permitted to buy and sell securi-ties authorized for investment under 62 O.S. 89.2(A).
¶ 50 We recognize that the ability to separately execute purchases and sales of securities gives rise to the possibility that these transactions may be purposefully arranged in such a manner so as to yield a result similar to that of a reverse repurchase agreement. Such an arrangement would require, however, an agreement by the Treasurer to repurchase the instruments transferred. 62 O.S. 89.2(A) does not authorize the Treasurer to enter such an agreement. Consequently, the authority to enter into a reverse repurchase agreement cannot legitimately be derived from the Treasurer's power to execute individual purchases and sales of authorized investment instruments.
 CONCLUSION ¶ 51 It is, therefore, the official opinion of the AttorneyGeneral that:
 1. (a) The Treasurer is authorized under 62 O.S.89.2(A)(7) (1990) to enter into repurchase agreements in whichthe state purchases securities with a simultaneous agreement toresell the securities, or their equivalents, to the originalseller at a higher price.
 (b) The Treasurer is not authorized under 62 O.S.89.2(A)(7) (1990) to enter into reverse repurchase agreementsin which the state sells securities with a simultaneous agreementto repurchase the securities, or their equivalents, from theoriginal buyer at a higher price.
 2. The Treasurer's authority under 62 O.S. 89.2(A)(7)(1990) to enter into repurchase agreements in which the statepurchases securities with a simultaneous agreement to resell thesecurities, or their equivalents, to the original seller at ahigher price, does not violate the "lending of credit" clause ofArticle X, Section 15 of the Oklahoma Constitution. To the extentthat Attorney General Opinion Nos. 81-183 and 81-189 conflictwith the views expressed herein, they are modified.
 3. The authorization to enter into a securities lendingprogram pursuant to 62 O.S. 90 (1990) does not empower theTreasurer to engage in repurchase or reverse repurchase agreementtransactions.
 4. The Treasurer is authorized, under 62 O.S. 89.2(A)(1990), to buy and sell securities authorized for investmentthereunder. However, the authority to enter into reverserepurchase agreements cannot legitimately be derived from theTreasurer's power to execute individual purchases and sales ofpermitted securities.
ROBERT H. HENRY ATTORNEY GENERAL OF OKLAHOMA
K.W. JOHNSTON ASSISTANT ATTORNEY GENERAL
[1] While the following discussion will outline the structure and terms of "standard" repurchase agreements as used in the money markets, it is essential to remember that the terms of these agreements, like the terms of any contract, may vary. Accordingly, they may be altered or omitted during the negotiation process to reflect the specific desires and objectives of the parties. For the purposes of your inquiry, however, we will consider only those transactions which are regarded by market convention as "standard" repurchase agreements. We expressly exclude from consideration "retail" repurchase agreements.
[2] 11 U.S.C. § 101(41) provides as follows:
"[R]epurchase agreement" (which definition also applies to a reverse repurchase agreement) means an agreement, including related terms, which provides for the transfer of certificates of deposit, eligible bankers' acceptances, or securities that are direct obligations of, or that are fully guaranteed as to principal and interest by, the United States or any agency of the United States against the transfer of funds by the transferee of such certificates of deposit, eligible bankers' acceptances, or securities with a simultaneous agreement by such transferee to transfer to the transferor thereof certificates of deposit, eligible bankers' acceptances, or securities as described above, at a date certain not later than one year after such transfers or on demand, against the transfer of funds[.]